## Exhibit A

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

by and among

GEORGE L. MILLER, AS CHAPTER 7 TRUSTEE FOR THE ESTATES OF
VIEWRAY, INC. AND VIEWRAY TECHNOLOGIES, INC.,

SELLER

and

MNP HOLDINGS LLC,

BUYER

DATED AS OF JANUARY 12, 2024

*192300_9999-1232127453-762/3.2*

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................... 2

ARTICLE II PURCHASE AND SALE ......................................................................... 10
    2.1    Purchase and Sale of Assets.......................................................................... 10
    2.2    Excluded Assets. ............................................................................................ 12
    2.3    Assumed Liabilities ...................................................................................... 13
    2.4    Excluded Liabilities ...................................................................................... 13
    2.5    Purchase Price and Deposit........................................................................... 15
    2.6    Allocation of Purchase Price ........................................................................ 16
    2.7    Third Party Consents..................................................................................... 17
    2.8    Cure Claims .................................................................................................. 17

ARTICLE III CLOSING ............................................................................................... 17
    3.1    Closing .......................................................................................................... 17
    3.2    Closing Deliverables. .................................................................................... 18

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER.............................. 19
    4.1    Organization and Qualification of Debtors................................................... 19
    4.2    Authority of Seller ........................................................................................ 19
    4.3    No Conflicts; Consents ................................................................................. 19
    4.4    Title to Purchased Assets .............................................................................. 20
    4.5    Insurance ....................................................................................................... 20
    4.6    Contracts ....................................................................................................... 20
    4.7    Intellectual Property...................................................................................... 20
    4.8    Taxes ............................................................................................................. 21
    4.9    Real Property ................................................................................................ 21
    4.10   Legal Proceedings ........................................................................................ 21
    4.11   No Other Representations and Warranties.................................................... 21

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 21
    5.1    Organization of Buyer.................................................................................. 22
    5.2    Authority of Buyer........................................................................................ 22
    5.3    No Conflicts; Consents ................................................................................. 22
    5.4    Brokers. No broker, finder or investment banker is entitled to any
             brokerage, finder's or other fee or commission in connection with the
             transactions contemplated by this Agreement or any Ancillary Document
             based upon arrangements made by or on behalf of Buyer.................................. 22
    5.5    Sufficiency of Funds .................................................................................... 22
    5.6    Legal Proceedings......................................................................................... 22
    5.7    Full Disclosure ............................................................................................. 23

-i-

# TABLE OF CONTENTS
### (continued)

**Page**

5.8    "As Is" Transaction ...................................................................................... 23

**ARTICLE VI COVENANTS** ........................................................................................ 23

6.1    Access to Information and Premises ......................................................... 23
6.2    Maintenance of the Purchased Assets ...................................................... 24
6.3    Notice of Certain Events ........................................................................... 25
6.4    Confidentiality .......................................................................................... 25
6.5    Post-Closing Access to Books and Records ............................................ 26
6.6    Closing Conditions ................................................................................... 27
6.7    Applicable Laws ....................................................................................... 27
6.8    Insurance ................................................................................................... 27
6.9    Transfer Taxes .......................................................................................... 27
6.10    Prorations ................................................................................................. 27
6.11    Further Assurances ................................................................................... 28
6.12    Bankruptcy Court Matters ........................................................................ 28
6.13    Assumption & Rejection of Executory Contracts ................................... 30
6.14    Use of Intellectual Property Following Closing ..................................... 31
6.15    Transfer of Governmental Authorizations ............................................... 31
6.16    Excluded Contracts; Consents .................................................................. 32
6.17    [Reserved] ................................................................................................. 33
6.18    [Reserved] ................................................................................................. 33

**ARTICLE VII CONDITIONS TO CLOSING** ............................................................ 33

7.1    Conditions to Obligations of All Parties .................................................. 33
7.2    Conditions to Obligations of Buyer ......................................................... 34
7.3    Conditions to Obligations of Seller ......................................................... 34

**ARTICLE VIII TERMINATION** .................................................................................. 35

8.1    Termination ............................................................................................... 35
8.2    Effect of Termination ................................................................................ 36

**ARTICLE IX MISCELLANEOUS** ............................................................................... 37

9.1    Expenses ................................................................................................... 37
9.2    Notices ...................................................................................................... 37
9.3    Interpretation ............................................................................................ 38
9.4    Headings ................................................................................................... 38
9.5    Severability ............................................................................................... 38
9.6    Entire Agreement ..................................................................................... 39
9.7    Assignment, Successors and No Third-Party Rights ............................... 39

**TABLE OF CONTENTS**
(continued)

|  |  | **Page** |
|---|---|---|
| 9.8 | Amendment and Modification; Waiver | 39 |
| 9.9 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. | 39 |
| 9.10 | No Survival | 40 |
| ARTICLE X COUNTERPARTS | | 40 |
| 10.1 | Counterparts | 40 |

Schedules

| Schedule 2.1 | Permitted Encumbrances |
|---|---|
| Schedule 2.1(c) | Tangible Personal Property |
| Schedule 2.1(d) | Leased Real Property |
| Schedule 2.1(e) | Registered Owned Intellectual Property |
| Schedule 2.2 | Excluded Assets |
| Schedule 4.5 | Existing Insurance Policies |
| Schedule 4.6 | Contracts |
| Schedule 4.7(b) | Intellectual Property Infringements |
| Schedule 4.8 | Tax Encumbrances |
| Schedule 6.13 | Contract & Cure Schedule |

Exhibits

| Exhibit A | Form of Bill of Sale |
|---|---|
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Intellectual Property Assignment Agreement |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of January 12, 2024, is entered into by and among George L. Miller, as chapter 7 trustee (the "***Trustee***" or the "***Seller***") for the estates of ViewRay, Inc., a Delaware corporation ("***ViewRay***"), and ViewRay Technologies, Inc., a Delaware corporation ("***ViewRay Technologies***" and, together with ViewRay, "***Debtors***"), and MNP Holdings LLC, a Wyoming limited liability company, or its designed affiliate ("***Buyer***").

WHEREAS, each Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on July 16, 2023 (the "***Petition Date***"), which cases are being jointly administered (as so jointly administered, the "***Bankruptcy Cases***");

WHEREAS, on October 26, 2023 (the "***Conversion Date***"), the Bankruptcy Court entered orders converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, and the Trustee was appointed and currently serves as chapter 7 trustee in the Bankruptcy Cases;

WHEREAS, the Trustee wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from the Trustee, certain specified assets and certain specified liabilities of the Debtors' bankruptcy estates (the "***Estates***"), all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below) are assets and liabilities of the Estates that are to be purchased by Buyer pursuant to the Sale Order (as defined below), free and clear of all Encumbrances (as defined below) other than Permitted Encumbrances (as defined below), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order approving such sale free and clear of all Encumbrances (other than Permitted Encumbrances), all as more specifically provided in this Agreement, and in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and the Local Rules (as defined below); and

WHEREAS, the Trustee and Buyer have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Assumed Liabilities associated therewith, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

# DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, including all causes of action under chapter 5 of the Bankruptcy Code.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, under no circumstance will Buyer on the one hand, or Seller and the Debtors on the other hand, be deemed Affiliates of one another notwithstanding the possession by Buyer (whether or not exercised) of any rights of control with respect to the Debtors or property of their Estates.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocable Consideration*" has the meaning set forth in Section 2.6.

"*Allocation Schedule*" has the meaning set forth in Section 2.6.

"*Alternative Transaction*" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by Seller, pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in the Debtors or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, any or all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyer or its Affiliates.

"***Ancillary Documents***" means the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Confidentiality Agreement, and the other agreements, instruments and documents required to be or otherwise delivered in connection with the transactions contemplated herein.

"***Antitrust Laws***" means any applicable United States, federal, state or foreign laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"***Assigned Contracts***" has the meaning set forth in Section 2.1(b).

"***Assignment and Assumption Agreement***" has the meaning set forth in Section 3.2(a)(iii).

"***Assignment Effective Date***" has the meaning set forth in Section 6.13(a).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Auction***" means an auction conducted by the Trustee in accordance with the Bid Procedures and the Bidding Procedures Order.

"***Bankruptcy Cases***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Code***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Court***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Rules***" has the meaning set forth in the recitals hereto.

"***Base Amount***" has the meaning set forth in Section 2.5(a).

"***Benefit Plan***" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, and all equity, severance, employment, consulting, change-of-control, bonus, incentive, deferred compensation and other benefit plans, agreements, programs, policies or commitments, whether or not subject to ERISA, (i) under which any current or former director, officer, employee or consultant of any Debtor or Seller has any right to payments or benefits from any Debtor or Seller; (ii) which are maintained, sponsored or contributed to by a Debtor or Seller or (iii) with respect to which any Debtor or Seller has any actual or contingent liability or makes or is required to make contributions with respect to such directors, officers, employees or consultants.

"***Bid Procedures***" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order for purposes of seeking bids for the purchase of the Purchased Assets, as amended or supplemented, including, without limitation pursuant to the Supplemental Notice of Extension of Certain Deadlines in the Bidding Procedures and Sale

Motion, Scheduling Auction and Sale, filed in the Bankruptcy Cases on December 13, 2023 [Dkt. 479], with only such changes as are reasonably satisfactory to Buyer.

"***Bidding Procedures Order***" means the Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Business or Substantially All of the Debtors' Assets; (II) Approving Procedures to Designate One or More Stalking Horse Bidders and Associated Bid Protections; (III) Scheduling an Auction for the Hearing to Approve the Sale of the Debtors' Business or Substantially All of the Debtors' Assets; (IV) Approving Notice of the Respective Date, Time, and Place for an Auction and for a Hearing on Approval of Sale; (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (VI) Approving the Form and Manner of Notice Thereof; and (VII) Granting Related Relief, entered by the Bankruptcy Court on August 23, 2023 [Dkt. 208].

"***Bill of Sale***" has the meaning set forth in Section 3.2(a)(ii).

"***Books and Records***" has the meaning set forth in Section 2.1(g).

"***Business Day***" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York or Dayton, Ohio are authorized or required by Law to be closed for business.

"***Buyer***" has the meaning set forth in the preamble.

"***Buyer Closing Certificate***" has the meaning set forth in Section 7.3(d).

"***Closing***" has the meaning set forth in Section 3.1.

"***Closing Date***" has the meaning set forth in Section 3.1.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Confidentiality Agreement***" means the Confidentiality Agreement, dated December 26, 2023, between the Trustee and Buyer entered into in connection with the potential disposition of the Estates' assets.

"***Contract & Cure Schedule***" has the meaning set forth in Section 6.13(a).

"***Contracts***" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, agreements, franchises, warranties, guaranties, bonds, consensual obligations, and all other agreements, commitments and legally binding arrangements, whether written or oral, to which any Debtor or Seller is a party.

"***Conversion Date***" has the meaning set forth in the Recitals hereto.

"*Cure Claims*" means, for any Assigned Contract, the amount (i) specified in the final Contract & Cure Schedule as increased by any additional amounts that may accrue pursuant to the terms of the Assigned Contract between the date of such final Contract & Cure Schedule and the Closing Date, (ii) as determined between Buyer and the counterparty to such Assigned Contract or (iii) as otherwise determined by Order of the Bankruptcy Court, as applicable.

"*Debtors*" has the meaning set forth in the preamble.

"*Default*" means (i) a violation, breach, or default, (ii) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (iii) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"*Deposit*" has the meaning set forth in Section 2.5(b).

"*Deposit Account*" has the meaning set forth in Section 2.5(b).

"*DOJ*" has the meaning set forth in Section 6.18.

"*Dollars*" or "*$*" means the lawful currency of the United States.

"*Encumbrance*" means any charge, claim (as defined in section 101(5) of the Bankruptcy Code), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, encumbrance, right of way, right of first refusal, other interest of any kind, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*Estates*" has the meaning set forth in the Recitals hereto.

"*Excluded Assets*" has the meaning set forth in Section 2.2.

"*Excluded Contracts*" has the meaning set forth in Section 2.2(b).

"*Excluded Liabilities*" has the meaning set forth in Section 2.4.

"*Existing Insurance Policies*" has the meaning set forth in Section 4.5.

"*Final Order*" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional

findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Bankruptcy Rule 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed with the Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed.

"***FDA***" means the United States Food and Drug Administration.

"***FTC***" has the meaning set forth in Section 6.18.

"***Governmental Authority***" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision (including the FDA), or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"***Governmental Authorization***" means any approval, consent, ratification, waiver, license, permit, registration, certificate, variance or other authorization issued or granted by any Governmental Authority.

"***Governmental Order***" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority of competent jurisdiction.

"***Initial Deposit***" has the meaning set forth in Section 2.5(b).

"***Insurance Proceeds***" has the meaning set forth in Section 2.1(j).

"***Intellectual Property***" means any and all intellectual property rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (i) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or

restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("*Patents*"); (ii) trademarks, service marks, brands, certification marks, designs, logos, trade dress, trade names, brand names, certification marks, corporate names (including "ViewRay", "ViewRay Technologies" and any variations thereof), emblems, signs or insignia, slogans, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing) ("*Trademarks*"); (iii) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("*Copyrights*"); (iv) internet addresses, internet domain names and social media accounts or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not registrations have been issued with respect thereto; (v) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques and all rights therein; (vi) computer software and code, including any and all software implementations of algorithms, models and methodologies, assemblers, scripts, macros, applets, compilers source code and object code, development tools, design tools and user interfaces, thereof, in any form or format, however fixed, computer programs, and databases (whether in source code, object code or other form); (vii) all industrial designs and any registrations and applications therefor throughout the world, 510(k) clearances, international approvals, licenses, dossiers, communications and meeting minutes regarding clearances, approvals, licenses, and dossiers with regulatory authorities; and (viii) all other intellectual or industrial property and proprietary rights.

"*Intellectual Property Assignment Agreement*" has the meaning set forth in Section 3.2(a)(iv).

"*Inventory*" has the meaning set forth in Section 2.1(a).

"*Law*" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"*Leased Real Property*" has the meaning set forth in Section 2.1(d).

"*Liabilities*" means any and all claims, debts, liabilities and other legally enforceable obligations.

"*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"***Material Adverse Effect***" means any change, event, development, occurrence or effect that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets, taken as a whole; provided, however, that a Material Adverse Effect will not be deemed to include (i) changes as a result of the commencement of the Bankruptcy Cases and the financial condition of Debtors, (ii) the execution and delivery of this Agreement, the announcement thereof or the consummation of the transactions contemplated by the Sale Documents, (iii) events or conditions arising from or related to changes in general business or economic conditions (whether in the United States or internationally) that do not disproportionately affect the Debtors, (iv) the effect of any change in Law or accounting rules or interpretation or enforcement thereof that do not disproportionately affect the Debtors, (v) the effect of any change arising in connection with hostilities, pandemics or disease (including COVID-19, or any derivation or mutation thereof), acts of war, sabotage or terrorism or military actions or any escalation or material worsening thereof, or (vi) compliance by Seller with the terms of this Agreement.

"***Next-Highest Bidder***" has the meaning set forth in the Bid Procedures.

"***Order***" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority of competent jurisdiction or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, unless otherwise indicated, whether preliminary or final).

"***Outside Date***" means February 7, 2024, unless extended in writing by Buyer and Seller.

"***Owned Intellectual Property***" means all Intellectual Property owned by the Debtors or the Estates as of the Conversion Date.

"***Permitted Encumbrances***" has the meaning set forth in Section 2.1.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Premises***" means the real property, buildings, structures, appurtenances, fixtures (including fixed machinery and fixed equipment), private roads, rail lines, spurs and other infrastructure, easements, rights of way and other improvements located at, on or under the Leased Real Property.

"***Privileged Communications***" means any records, information, ledgers, files, invoices, documents, work papers, work product, drafts, presentations, analysis, correspondence, summaries, or similar items that, in whole or part, constitutes privileged communications between either or both of the Debtors, Seller, and their respective counsel or other professional advisors.

"***Purchase Price***" has the meaning set forth in Section 2.5(a).

"***Purchased Assets***" has the meaning set forth in Section 2.1.

"***Registered Owned Intellectual Property***" has the meaning set forth in Section 2.1(e).

"***Representative***" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents or representatives of such Person.

"***Sale Documents***" means this Agreement and the Ancillary Documents.

"***Sale Hearing Date***" means the date set by the Bankruptcy Court to consider the entry of the Sale Order.

"***Sale Order***" has the meaning set forth in Section 6.12(b).

"***Seller***" has the meaning set forth in the preamble.

"***Seller Closing Certificate***" has the meaning set forth in Section 7.2(d).

"***Successful Bidder***" has the meaning set forth in the Bid Procedures.

"***Supplemental Deposit***" has the meaning set forth in Section 2.5(b).

"***Tangible Personal Property***" has the meaning set forth in Section 2.1(c).

"***Tax***" or "***Taxes***" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, in each case, in the nature of a tax, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties. Tax shall also include any tax liability incurred by any Third Party for which any Debtor, either Estate, or Seller is liable pursuant to Law or by contract.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Third Party***" means any Person and/or group of Persons other than the Debtors, Seller, Buyer or any of their respective Affiliates.

"***Transfer Taxes***" has the meaning set forth in Section 6.9.

"***Trustee***" has the meaning set forth in the preamble.

"***Trustee's Knowledge***" or any other similar knowledge qualification means the actual knowledge of the Trustee or any of his attorneys, accountants, employees, brokers, bankers, investment bankers, financial advisors, agents, or other representatives.

"***ViewRay***" has the meaning set forth in the preamble.

"***ViewRay Technologies***" has the meaning set forth in the preamble.

## ARTICLE II

## PURCHASE AND SALE

2.1   <u>Purchase and Sale of Assets</u>.

Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and subject to the terms and conditions set forth herein and the entry of the Sale Order and the Sale Order becoming a Final Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, other than the Encumbrances identified on <u>Schedule 2.1</u> (collectively, "***Permitted Encumbrances***"), all of Seller's and the Estates' right, title and interest in, to and under all of the Estates' assets, properties, and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located (whether at the Premises or any other location), in the physical possession of Seller or another Person (other than the Excluded Assets) (collectively, the "***Purchased Assets***"), including the following, *provided* that if any Purchased Assets are not located at the Premises, Buyer shall be solely responsible for all costs and expenses associated with obtaining possession of any such Purchased Assets and delivering such Purchased Assets to the Premises:

(a)   <u>Inventory</u>. All inventory and packaging owned by Sellers (collectively, the "***Inventory***");

(b)   <u>Contracts</u>. All of the rights of the Debtors, the Estates, and/or Seller under all Contracts set forth in the Contract & Cure Schedule to the extent such Contracts are assumed

-10-

and assigned to Buyer pursuant to Section 6.13, including any and all associated deposits (collectively, the "***Assigned Contracts***");

(c)     Tangible Personal Property. All furniture, fixtures, equipment, machinery, rolling stock, if any, construction materials, furnishings, and other personal property owned by the Debtors and the Estates including all trade fixtures, maintenance and repair supplies, spares (including grease, oils, chemicals and containers in which any of them are stored), desks, chairs, tables, tools, all computer equipment, telephones, other office equipment, replacement parts, and all other tangible personal property  (other than Excluded Assets), including the items listed on Schedule 2.1(c) (collectively, the "***Tangible Personal Property***");

(d)     Real Property. All Sellers' leasehold interest in real property leased by Sellers set forth on Schedule 2.1(d) (the "***Leased Real Property***");

(e)     Owned Intellectual Property. All Owned Intellectual Property, including all Patents, Trademarks, Copyrights and registered domain names which are set forth on Schedule 2.1(e) (the "***Registered Owned Intellectual Property***").

(f)     Governmental Authorizations. All Governmental Authorizations to the extent assignable or otherwise transferable, if any;

(g)     Books and Records. All available books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production and operations reports, technical manuals, information and records, personnel, payroll, and employment records, and financial and accounting records, other than the items described in Section 2.2(c) and Section 2.2(m) hereof (collectively, the "***Books and Records***");

(h)     Correspondence. All written paper or electronic correspondence with or to any Governmental Authority in Seller's physical possession, custody, or control, including letters, minutes and official contact reports relating to any aspect of the Debtors, their Estates, the Purchased Assets, the Assumed Liabilities or the Debtors' business prior to the Closing Date (collectively, "***Correspondence***");

(i)     Goodwill. All the goodwill of Debtors, their Estates, and/or the Debtors' business prior to the Closing Date including, without limitation, the right to own and use all trade names used by the Debtors and/or the Seller; and

(j)     Insurance Proceeds. All proceeds received or receivable in respect of the Purchased Assets under the Existing Insurance Policies with respect to any damage, loss, act, matter or thing occurring or existing after the date hereof to the Closing Date ("***Insurance***

-11-

***Proceeds***"), including, for greater certainty any amounts paid after Closing and irrespective of whether a claim has been filed or, if filed, accepted by the provider thereof prior to Closing; and

(k)    Accounts Receivable.  All accounts receivable of the Estates accruing prior to the Closing Date.

2.2    Excluded Assets.

Notwithstanding the foregoing, the Purchased Assets shall not include the following assets of the Debtors, the Estates, or the Seller (collectively, the "***Excluded Assets***"):

(a)    cash and cash equivalents, except for any Insurance Proceeds received as contemplated by Section 2.1(j);

(b)    all Contracts other than Assigned Contracts, if any (the "***Excluded Contracts***");

(c)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization or Tax matters of the Debtors;

(d)    all Benefit Plans and assets attributable thereto;

(e)    the assets, properties and rights specifically set forth on Schedule 2.2(e), together with any additions to such schedule that Buyer shall deliver to Sellers not later than the conclusion of the Auction, if any, or two (2) days prior to the Sale Hearing Date, if no Auction takes place (subject to Section 2.2(o) hereof);

(f)    all promissory notes and loans of any kind or nature;

(g)    deposits held by Seller, the Estates, or the Debtors in connection with any Excluded Contracts, and any deposits made by Seller, the Estates, or the Debtors in connection with the Bankruptcy Cases;

(h)    royalties, fees, income, payments, and other proceeds with respect to Intellectual Property that accrued prior to the Closing Date and any security, claim, remedy or other right related to any of the foregoing;

(i)    the rights which accrue or will accrue to Seller and the Estates under this Agreement and the Ancillary Documents;

(j)    all claims, rights, credits, cross claims, causes of action, Actions, defenses and rights of set-off and other rights of Seller and the Estates to the extent not a Purchased Asset or Assumed Liability or related to a Purchased Asset or Assumed Liability;

(k)    all insurance and utility deposits or refunds owing to Seller or the Estates that are not Purchased Assets;

(l)    all insurance policies and insurance agreements, including any directors and officers' insurance policies;

(m)    books and records (i) that relate to corporate governance or Tax matters of the Debtors, Seller, or the Estates or the Debtors' business prior to the Closing Date, or (ii) that constitute Privileged Communications;

(n)    all Tax assets and benefits of the Debtors, Seller, or the Estates (including any Tax credits or refunds or claims for refunds) of any nature relating to the Pre-Closing Tax Period; and

(o)    any Purchased Assets that are designated as Excluded Assets by Buyer, in Buyer's sole discretion, at any time prior to or during the Bankruptcy Court hearing to consider the Sale Order; *provided*, *however*, that designating any Purchased Assets as Excluded Assets shall not affect the Purchase Price.

2.3    <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of the Debtors, the Estates, and Seller (collectively, the "***Assumed Liabilities***"), and no other Liabilities:

(a)    all Liabilities in respect of the Assigned Contracts, if any, to the extent that such Liabilities thereunder arise from a period *after* the Closing Date;

(b)    all Liabilities arising from the conduct of the business or the use or operation of the Purchased Assets by Buyer *from and after* the Closing Date;

(c)    the Cure Claims in connection with Assigned Contracts, if any; and

(d)    Taxes, and any related filing requirements, that arise out of the consummation of the transactions contemplated hereby.

2.4    <u>Excluded Liabilities</u>. Notwithstanding the provisions of <u>Section 2.3</u> or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of the Debtors, the Estates, or Seller or related to the Debtors' business prior to the Closing Date or the Purchased Assets of any kind or nature

-13-

whatsoever other than the Assumed Liabilities (collectively, the "***Excluded Liabilities***"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following (in each case, excluding any Assumed Liabilities (including Cure Claims)):

(a)      all Liabilities arising out of or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)      all Liabilities for (i) Taxes of the Debtors, the Estates, and/or Seller (or any stockholder or Affiliate of the Debtors, the Estates, and/or Seller) relating to the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period, except as set forth in Section 2.3(d); or (ii) other Taxes of the Debtors, the Estates, and/or Seller (or any stockholder or Affiliate of the Debtors, the Estates, and/or Seller) of any kind or description including any Liability for Taxes of the Debtors, the Estates, and/or Seller (or any stockholder or Affiliate of the Debtors, the Estates, and/or Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law;

(c)      all Liabilities relating to or arising out of the Excluded Assets (unless and until such time as an Excluded Asset, with respect to the Liabilities relating to or arising out of such Excluded Asset, expressly becomes a Purchased Asset pursuant to the terms of this Agreement);

(d)      all Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the Debtors' business prior to the Closing Date or the Purchased Assets to the extent such Action relates to the Debtors' business prior to the Closing Date or the Purchased Assets for any period on or prior to the Closing Date;

(e)      all recall, design defect or similar claims arising from any products manufactured or sold or any service performed, if any, by the Debtors, the Estates, and/or the Seller prior to the Closing Date;

(f)      all product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by the Debtors, the Estates, and/or Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by the Debtors, the Estates, and/or Seller prior to the Closing Date;

(g)      all Liabilities of the Debtors, the Estates, and/or Seller under any Benefit Plans;

(h)     all trade accounts payable;

(i)     all Liabilities of the Debtors, the Estates, and/or Seller or their respective Affiliates relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets or Assumed Liabilities;

(j)     all Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of the Debtors, the Estates, and/or Seller (including with respect to any breach of fiduciary obligations by same);

(k)     all Liabilities under the Excluded Contracts;

(l)     all Liabilities associated with debt, loans or credit facilities of the Debtors, the Estates, and/or Seller and/or their respective Affiliates with respect to the Purchased Assets; and

(m)     all Liabilities arising out of, in respect of or in connection with the failure by the Debtors, the Estates, and/or Seller to comply with any Law or Governmental Order.

2.5     <u>Purchase Price and Deposit</u>.

(a)     The purchase price for the Purchased Assets shall be: (i) $5,205,000.00 (Five Million Two Hundred Five Thousand Dollars) in cash, or such greater amount bid at the Auction if Buyer is the Successful Bidder (or the Next-Highest Bidder if Seller fails to close an Alternative Transaction with the Successful Bidder) (the "***Base Amount***"), *plus* (ii) the assumption of the Assumed Liabilities (collectively, the "***Purchase Price***"). At the Closing, Buyer shall pay Sellers the Base Amount, in cash *minus* the Deposit as provided in Section 2.5(b).

(b)     Contemporaneously with Buyer's delivery of this Agreement to Seller, Buyer shall deposit into an account maintained, identified, and established by the Trustee (the "***Deposit Account***"), in immediately available funds, an amount equal to the percent (10%) of the Purchase Price (the "***Initial Deposit***"). If an Auction occurs and Buyer is declared the Successful Bidder at the Auction, Buyer shall, if necessary, within one (1) Business Day of the close of the Auction, supplement the Initial Deposit such that Buyer's deposit shall be equal to an amount that is ten percent (10%) of the portion of the Purchase Price to be paid in cash at Closing to Seller included in Buyer's final bid submitted at the Auction (the "***Supplemental Deposit***" and, together with the Initial Deposit, the "***Deposit***"). Upon receipt of any amount of the Deposit, Seller shall maintain such amount of the Deposit in the Deposit Account, and such funds shall be disbursed solely in accordance with the terms of this Agreement, the Bidding Procedures Order, and any other Final Order. The Deposit shall be held in trust by the Seller until such time as the Deposit is

disbursed or retained pursuant to Sections 2.5(c)-(h), and the Deposit shall not become property of the Seller, the Estates, or the Debtors unless and until disbursed to or retained by Seller pursuant to Sections 2.5(c) or (f).

(c)    If Buyer is the Successful Bidder, at the Closing, Seller shall disburse the Deposit to Seller and such Deposit shall automatically be deemed to be credited toward payment of the Purchase Price.

(d)    In the event Seller and Buyer terminate this Agreement under Section 8.1(a) or Section 8.1(d) of this Agreement, Seller shall disburse the Deposit to Buyer without set-off or deduction within three (3) Business Days to be retained by Buyer for Buyer's own account.

(e)    In the event Buyer terminates this Agreement under Section 8.1(b) of this Agreement, Seller shall to disburse the Deposit to Buyer without set-off or deduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

(f)    In the event Seller terminates this Agreement under Section 8.1(c)(i) or Section 8.1(c)(ii)(y) of this Agreement, no sooner than five (5) Business Days after such termination, Seller shall retain the Deposit for Seller's own account in full and final settlement of damages resulting from such termination.

(g)    In the event Seller terminates this Agreement under Section 8.1(c)(ii)(x) of this Agreement, Seller shall disburse the Deposit to Buyer without any set-off or deduction to be retained by Buyer for Buyer's own account.

(h)    If this Agreement shall be automatically terminated under Section 8.1(e) of this Agreement, Seller shall disburse the Deposit to Buyer without set-off or reduction within three (3) Business Days to be retained by Buyer for Buyer's own account.

2.6    Allocation of Purchase Price. Seller and Buyer agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting the amount realized for Tax purposes (the "**Allocable Consideration**") will be allocated among the Purchased Assets in a manner consistent with section 1060 of the Code and any Treasury Regulations promulgated thereunder. Buyer will, no later than sixty (60) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "**Allocation Schedule**"). Buyer and Seller will endeavor for a period of not less than thirty (30) days to resolve any disputes related to the Allocation Schedule. Neither Buyer nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns) except as may be required pursuant to a "determination" under section 1313(a) of the Code (or any similar provision of state, local or foreign Law); provided, however, that the Allocation Schedule shall not, and shall not be interpreted to, have any

-16-

effect on any distributions to creditors of either or both of the Debtors or Estates. In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this Section 2.6 to the contrary, if Buyer and Seller are not able to agree to the Allocation Schedule, each party shall be allowed to use that party's own formulation with respect to the allocation of the Purchase Price and the Assumed Liabilities.

2.7    Third Party Consents. Notwithstanding the Sale Order or any provision of the Bankruptcy Code, to the extent that either or both of the Debtors', the Estates' or Seller's rights under any Contract constituting a Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful (unless the Bankruptcy Court has entered an order providing that such consent is not required and such assignment is otherwise permitted by Law), provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur and not be delayed notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and Seller and Buyer, each at its own expense, shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent(s) as promptly as possible.

2.8    Cure Claims. With respect to each of the Assigned Contracts assigned to Buyer, if any, Buyer shall assume and pay on the Assignment Effective Date for each such Assigned Contract, all Cure Claims, if any. Within five (5) Business Days after the Closing Date, Buyer shall provide to Seller a written certification that all Cure Claims required to be paid on the Closing Date, if any, have been satisfied and paid in full by Buyer. Upon the reasonable request of Seller, Buyer shall provide to Seller documentation evidencing the full payment and satisfaction of any Cure Claim.

## ARTICLE III

## CLOSING

3.1    Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely via the exchange of documents and signatures, or in such other manner as will be mutually acceptable between Buyer and Seller, on (a) the second (2nd) Business Day after the day on which the last of the closing conditions set forth in Article VII has been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), but in no event later than the Outside Date, or (b) such other date as the Buyer and Seller mutually agree upon in writing. The date on and time at which the Closing actually occurs is herein referred to as the "***Closing Date***".

3.2    <u>Closing Deliverables</u>.

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    the Purchased Assets;

(ii)    a bill of sale substantially in the form of <u>Exhibit A</u> hereto with such revisions as agreed to by Buyer and Seller (the "***Bill of Sale***") and duly executed by Seller;

(iii)    an assignment and assumption agreement substantially in the form of <u>Exhibit B</u> hereto with such revisions as agreed to by Buyer and Seller (the "***Assignment and Assumption Agreement***") and duly executed by Seller;

(iv)    an intellectual property assignment agreement substantially in the form of <u>Exhibit C</u> hereto with such revisions as agreed to by Buyer and Seller (the "***Intellectual Property Assignment Agreement***") and duly executed by Seller;

(v)    the Seller Closing Certificate;

(vi)    a copy of the Sale Order entered by the Bankruptcy Court;

(vii)    [reserved];

(viii)    a duly completed and executed Internal Revenue Service Form W-9 from Seller; and

(ix)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Base Amount (as may be amended at the Auction), *minus* the Deposit;

(ii)    the Assignment and Assumption Agreement, duly executed by Buyer;

(iii)    the Intellectual Property Assignment Agreement, duly executed by Buyer; and

(iv)    the Buyer Closing Certificate.

-18-

(v)      [reserved]

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, Seller represents and warrants to Buyer, with respect to itself, the Debtors, and the Estates, that the statements contained in this Article IV are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this Article IV shall not survive the Closing.

4.1    Organization and Qualification of Debtors. Each Debtor is a corporation duly organized, validly existing and will be in good standing under the Laws of the state of Delaware as of the Closing and is qualified to do business and will be in good standing under the Laws of the state of Delaware as of the Closing. Each Debtor has commenced a Bankruptcy Case, each of which is currently pending in the Bankruptcy Court.

4.2    Authority of Seller. Subject only to entry of the Sale Order in the Bankruptcy Cases, Seller has full power and authority to enter into this Agreement and the Ancillary Documents to which it is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any Ancillary Document to which Seller is or will be a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller, if necessary. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms. When each Ancillary Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), each such Ancillary Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

4.3    No Conflicts; Consents. Subject to entry of the Sale Order, neither the execution, delivery nor performance of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate the Debtors' organizational documents; (b) result in a breach or Default under, or create in any Person the right to terminate, cancel, accelerate or modify, or require any notice, consent or waiver under, any Assigned Contract; (c) violate any Law applicable to Seller, either Estate, either Debtor, or the Purchased Assets; (d) result in the creation of any Encumbrance on any Purchased Asset which will not be removed or satisfied at or prior to Closing, or (e) require the consent, notice, declaration,

-19-

or filing with or other action by any Person or require any permit, license, or Governmental Authorization (except in the case of clauses (b) or (c) of this <u>Section 4.3</u>, that has not had, and would not reasonably be expected to have, a Material Adverse Effect); provided it is acknowledged by Buyer that Buyer will be required to obtain certain permits, licenses or Governmental Authorizations to operate the Purchased Assets.

4.4    <u>Title to Purchased Assets</u>. To Seller's Knowledge, no Person other than Seller and the Estates has title to, a leasehold interest in or a license to use the Purchased Assets (other than Leased Real Property, which is covered by <u>Section 4.9</u>, Owned Intellectual Property, which is covered by <u>Section 4.7</u>, and any Purchased Assets that are subject to Assigned Contracts to the extent expressly set forth such Assigned Contracts), other than Permitted Encumbrances. Subject to entry of the Sale Order, at Closing, Buyer will be vested with good and marketable title to, valid leasehold interests in or a license to use, as applicable, all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of all Encumbrances other than Permitted Encumbrances.

4.5    <u>Insurance.</u> To Seller's Knowledge, <u>Schedule 4.5</u> sets forth a true and complete list of all insurance policies (the "***Existing Insurance Policies***") maintained by Seller and the Estates with respect to the Purchased Assets, together with the insurer, the amount of the coverage, the type of insurance, the policy number and any pending claims thereunder. Seller and the Estates are up-to-date in the payment of all premiums and other amounts payable under the Existing Insurance Policies that it carries to maintain the Existing Insurance Policies in full force and effect, and Seller and the Estates shall continue to make such payments until Closing. To Seller's Knowledge, as of the date hereof, all such policies are in full force and effect in all material respects and are sufficient for compliance by Seller and the Estates with all applicable Laws.

4.6    <u>Contracts.</u> To Seller's Knowledge, <u>Schedule 4.6</u> sets forth a complete and accurate list of all Contracts of the Debtors, the Estates, and Seller that are still in effect related to the ownership, licensing and/or operation of the Purchased Assets or the Debtors' business prior to the date hereof.

4.7    <u>Intellectual Property</u>.

(a)    To Seller's Knowledge, all Registered Owned Intellectual Property is subsisting, valid and enforceable in all material respects.

(b)    To Seller's Knowledge, except as set forth on <u>Schedule 4.7(b),</u> (i) there are no inquiries, investigations or Actions, and none of the Debtors, the Estates, and Seller has received written notice from any Third Party, alleging infringement by the Debtors, the Estates, and/or Seller of Intellectual Property rights of any Person; and (ii) no Third Party is infringing, misappropriating or otherwise violating any material Owned Intellectual Property.

-20-

4.8     Taxes. To Seller's Knowledge, except as set forth in Schedule 4.8, there are no Encumbrances for Taxes (other than for current Taxes not yet due and payable or for Taxes filed as a result of the Bankruptcy Cases) upon the Purchased Assets.

4.9     Real Property. At Closing, Seller and the Estates will have a good and marketable leasehold interest in each Leased Real Property free and clear of all Encumbrances, other than Permitted Encumbrances and Encumbrances to be paid off or otherwise extinguished on the Closing Date. On the Closing Date, Seller shall convey to Buyer at the Closing a good and marketable leasehold interest in each Leased Real Property free and clear of all Encumbrances, other than Permitted Encumbrances. None of the Debtors, the Estates, and Seller has leased or otherwise granted to any Person the right to use or occupy the Leased Real Property or any portion thereof, and there are no Persons in possession or Person having the right to occupy or use any of the Leased Real Property. The Debtors, the Estates, and Seller do not own any real property.

4.10    Legal Proceedings. Other than as disclosed (a) to Buyer in writing or (b) in the filings under the Bankruptcy Cases, to Seller's Knowledge, there are no Actions pending or threatened against or by the Debtors, the Estates, and/or Seller that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement and, to Seller's Knowledge, other than as disclosed in writing by legal counsel to Seller to legal counsel to Buyer, no event has occurred or circumstances exist that are reasonably likely to give rise or serve as a basis for any such Action.

4.11    No Other Representations and Warranties. Except for the representations and warranties contained in this Article IV, neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Debtor's business prior to the date hereof and the Purchased Assets furnished or made available to Buyer and its Representatives, management presentations or in any other form in expectation of the transactions contemplated hereby or as to the future revenue, profitability or success of the Debtors' business prior to the date hereof, or any representation or warranty arising from statute or otherwise in law.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

As a material inducement to Seller to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this Article V shall not survive the Closing.

5.1     <u>Organization of Buyer</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Wyoming.

5.2     <u>Authority of Buyer</u>. Buyer has full limited liability company power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is or will be a party, the performance by Buyer of its respective obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.

5.3     <u>No Conflicts; Consents</u>. The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Documents to which Buyer is or will be a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of organization, operating agreement, or other organizational or governing documents of Buyer, as applicable; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

5.4     <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

5.5     <u>Sufficiency of Funds</u>. Buyer has sufficient cash on hand to enable it to make payment of the Purchase Price and consummate the transactions contemplated by and in the timeframe set forth in this Agreement.

5.6     <u>Legal Proceedings</u>. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; and no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

5.7     <u>Full Disclosure</u>. Buyer does not have knowledge of any facts or circumstances that would constitute a breach of any representation or warranty made by Seller pursuant to this Agreement.

5.8     "<u>As Is</u>" <u>Transaction</u>. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN <u>ARTICLE IV</u> ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY REAL OR PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY CONSTITUTING THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE IV</u>, IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI

## COVENANTS

6.1     <u>Access to Information and Premises</u>.

(a)     Provided that Buyer shall not be entitled to access any materials containing Privileged Communications and subject to applicable Law, from and after the date hereof and until

-23-

the Closing Date or earlier termination of this Agreement pursuant to <u>Article VIII</u>, Seller shall, upon reasonable advance notice, afford Buyer's officers, independent public accountants, counsel, consultants and other representatives, reasonable access, at Buyer's sole expense, during normal business hours at a location determined at the reasonable discretion of Seller, in such manner as to not disrupt or interfere with the normal operation of Seller's or the Debtors' business, to the Premises and to all Books and Records (including the right of Buyer and/or its Representatives to make copies) pertaining to the Purchased Assets and the Assumed Liabilities in Seller's possession, custody, or control; <u>provided</u>, <u>however</u>, that Seller shall not be required to provide such access if it (i) would involve disclosure of any materials containing any Privileged Communication, or (ii) would be in violation of applicable Laws or the provisions of any agreement to which any Seller is a party.

(b)     From and after the date of this Agreement until the Closing Date, Buyer may communicate with any counterparty to any Contracts to which the Debtors, the Estates, and/or Seller is a party, including, without limitation, customers, suppliers, and other vendors, in connection with the transactions contemplated hereby and any present or former employees of the Debtors, the Estates, and/or Seller without the prior written consent of Seller, except as set forth in the Confidentiality Agreement (which the parties acknowledge remains in full force and effect).

(c)     Seller shall (i) upon selecting Buyer as the Successful Bidder on the date hereof close the virtual data room, and (ii) on the Closing Date give notice under any non-disclosure or confidentiality agreements entered into with other parties in connection with the sale process relating to the transactions contemplated hereby to return or destroy any confidential information.

6.2     <u>Maintenance of the Purchased Assets</u>.

(a)     Until the Closing Date, except: (i) as required by Law, including in connection with the Bankruptcy Cases; (ii) as expressly set forth in this Agreement; or (iii) as otherwise consented to by Buyer in writing, Seller shall not:

(i)     enter into, amend or modify in any material respect or terminate or reject any Contract on the Contract & Cure Schedule;

(ii)     waive or release any material right or claim of the Debtors, the Estates, and/or Seller relating to the Assigned Contracts, if any, or, without first obtaining Buyer's express written consent, such consent not to be unreasonably withheld or delayed, any of the Purchased Assets;

(iii)     other than in the ordinary course, sell, lease, remove from the Premises, transfer, license or otherwise dispose of, abandon or permit to lapse, fail to take any

material action necessary to maintain, enforce or protect, or create any Encumbrance on, any Purchased Assets;

         (iv)    take any other action that could reasonably be expected to materially and adversely affect the value of the Purchased Assets or the Assumed Liabilities; or

         (v)    agree to take any of the foregoing actions.

         (b)    Except as consented to or approved in writing by Buyer, from the date of this Agreement until Closing, Sellers shall use commercially reasonable efforts to preserve intact the Purchased Assets, reasonable wear and tear excepted, or as necessary to keep all of the Purchased Assets in substantially the same condition as they are on the date of this Agreement.

        6.3    <u>Notice of Certain Events</u>.

         (a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

         (i)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

         (ii)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Purchased Assets or the Assumed Liabilities;

         (iii)    the occurrence, or failure to occur, of any event, which occurrence or failure would be likely to cause any of the representations or warranties of Seller contained in this Agreement or in any Ancillary Document to be untrue or inaccurate in any material respect (or, if already qualified by materiality, in all respects); and

         (iv)    the occurrence of any fact or circumstance that could reasonably be expected to have a Material Adverse Effect.

         (b)    Buyer's receipt of information pursuant to this <u>Section 6.3</u>, and any failure by Seller to give any notice under this <u>Section 6.3</u>, shall not (i) operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement or (ii) give Buyer an independent right to terminate this Agreement, provided that the content of such notice may give rise to such a right.

        6.4    <u>Confidentiality</u>.

         (a)    Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance

with the provisions of the Confidentiality Agreement (other than as may be permitted or required under this Agreement), information provided to, or reviewed or accessed by, Buyer or its Representatives pursuant to this Agreement, including under Section 6.1. If this Agreement is, for any reason, terminated prior to Closing, the Confidentiality Agreement and the provisions of this Section 6.4 shall nonetheless continue in full force and effect.

(b)     Notwithstanding anything to the contrary in this Agreement or the Confidentiality Agreement, the Confidentiality Agreement shall terminate on the Closing Date.

(c)     Each of the parties hereto agrees that from and after the Closing Date, Seller and Buyer (and its Affiliates) and their respective successors and assigns will have the following rights regarding Privileged Communications. Seller shall continue to hold and control the privilege with respect to all Privileged Communications that existed prior to the Closing Date. Seller shall have no obligation to include in the Books and Records any records of any Privileged Communications. It may be impracticable to remove from the Books and Records all records of any Privileged Communications. No attorney-client privilege, attorney work product or other applicable evidentiary privilege or protection shall be waived or is intended to be waived with respect to any such Privileged Communications. Buyer (to the extent marked "privileged", on law firm letterhead or otherwise reasonably ascertainable as attorney-client privileged by a non-attorney) and Seller shall protect all Privileged Communications from disclosure or release. In the event that a dispute arises between Buyer, on the one hand, and a Third Party, on the other hand, Buyer or any of its Affiliates may assert the attorney-client privilege to prevent the disclosure of any Privileged Communications to such Third Party; provided, however, that neither Buyer nor any of its Affiliates may waive such privilege without the prior written consent of Seller or unless ordered by a court of competent jurisdiction. Likewise, in the event that a dispute arises between Seller, on the one hand, and a Third Party, on the other hand, Seller may assert the attorney-client privilege to prevent the disclosure of any privileged communications to such Third Party; provided, however, that Seller may not waive such privilege without the prior written consent of Buyer or unless ordered by a court of competent jurisdiction.

6.5     Post-Closing Access to Books and Records. In order to facilitate the resolution of any claims made against or incurred by Seller and/or the Estates, the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), or for any other reasonable purpose, for a period of two (2) years after the Closing Date (subject to extension if agreed to in writing by Buyer and Seller), Buyer shall: retain the Books and Records (and, to the extent acquired hereunder, the computer servers upon which any such Books and Records are maintained) and any Correspondence relating to periods prior to the Closing in a manner reasonably consistent with the manner in which Buyer maintains its own records; and upon reasonable notice and at Seller's own cost and expense, afford Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records and Correspondence.

6.6     Closing Conditions. From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

6.7     Applicable Laws. From the date hereof until Closing, Seller shall comply with all applicable Laws as same pertain to Purchased Assets to the extent that failure to comply with any such applicable Laws would result in the occurrence of a Material Adverse Effect. Seller shall use commercially reasonable efforts to ensure that the Sale Order shall provide either that (a) Sellers have complied with any applicable bulk sale or bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including delivering all notifications to taxing authorities as required under applicable law or (b) compliance with such Laws described in clause (a) is not necessary or appropriate under the circumstances.

6.8     Insurance. From the date hereof until the Closing Date, Seller shall cause the Existing Insurance Policies that it and/or the Estates carry not to be cancelled or terminated or any other coverage thereunder to lapse, unless simultaneously with such terminations, cancellation or lapse, replacement policies underwritten by insurance companies providing the current coverage or insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies, and where possible, for substantially similar premiums, are in full force and effect.

6.9     Transfer Taxes. Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes ("***Transfer Taxes***") that may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer. Buyer shall indemnify and hold the Seller harmless from and against any and all Actions, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes. Buyer and the Seller shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

6.10    Prorations. All rent, Taxes (other than Taxes imposed or assessed on income and Transfer Taxes), utilities, and prepaid expenses related to the Purchased Assets shall be prorated between Seller and Buyer as of the Closing Date; provided, however, that for the avoidance of doubt, all property Taxes shall be pro-rated based on the period to which the tax applies without regard to the date of assessment. All rent, Taxes (other than Taxes imposed or assessed on income and Transfer Taxes), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods prior to and including the Closing Date (other than Cure Claims), shall be the obligations of the Estates and Seller, and all rent, Taxes (other than Taxes imposed or assessed on income), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods after the Closing Date shall be the obligations of and shall be paid in full or otherwise satisfied by Buyer. Any Rent shall be prorated on the basis of a thirty (30) day month. If, at Closing, the Leased Real Property or any part thereof shall have been affected by an assessment or assessments, which are

-27-

or may become payable in annual installments, of which the first installment is then a charge or lien, then for the purposes of this Agreement, all the unpaid installments of any such assessment due and payable in calendar years prior to the year in which the Closing occurs shall be paid by Seller and the Estates and all installments becoming due and payable after the Closing shall be assumed and paid by Buyer, except, however, that any installments which are due and payable in the calendar year in which the Closing occurs shall be adjusted pro rata. However, if such an assessment or assessments shall be due in one lump sum payment, then to the extent such assessment(s) is for improvements in place or substantially in place as of the date of this Agreement, then such assessment(s) shall be paid by Seller and the Estates but if such assessment(s) is for improvements to be made subsequent to the date of this Agreement, then the same shall be paid by Buyer.

6.11    Further Assurances. Following the Closing, each of the parties hereto shall, and Buyer shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

6.12    Bankruptcy Court Matters.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids. Until the designation of a Successful Bidder in accordance with the Bid Procedures and the Bidding Procedures Order, Seller is permitted to cause Seller's Representatives to, initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person (in addition to Buyer and Buyer's Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Seller may, in accordance with the Bid Procedures and Bidding Procedures Order, respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Sellers and perform any and all other acts related thereto that are required under the Bankruptcy Code, Orders of the Bankruptcy Court, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Debtors' business prior to the date hereof and the assets of the Estates to prospective purchasers.

(b)    If Buyer is designated as the Successful Bidder, Seller shall seek an order of the Bankruptcy Court, in a form acceptable to Buyer (the "**Sale Order**"), that, among other things, (i) approves the sale of the Purchased Assets to Buyer, and authorizes Seller to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, (ii) includes a finding that Buyer and any designee of Buyer under Section 9.7 of this Agreement is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances other than Permitted Encumbrances, (iv) approves Seller's assumption and

assignment to Buyer of the Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code subject to Buyer's payment of applicable Cure Claims and ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, and (v) includes findings of fact and conclusions of law that Buyer is not a successor to the Debtors, the Estates, or Seller and shall have no liability as a successor to the Debtors, the Estates, or Seller; provided that nothing in the Sale Order or this Agreement (x) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the Closing Date or (y) authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. On or prior to the date hereof, Buyer provided Seller with such financial and other information supporting Buyer's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, if applicable, including Buyer's financial wherewithal and willingness to perform under the Assigned Contracts, if any, in a form that allows Seller to serve such information on any counterparties to the Assigned Contracts, if any, in accordance with the  Bidding Procedures Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Buyer of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order and the Sale Order becoming a Final Order.

(c)     Seller and Buyer agree that, in the event that Buyer is not the Successful Bidder at the Auction, and an Alternative Transaction with the Successful Bidder does not close, if and only if Buyer is the Next-Highest Bidder, Buyer shall promptly consummate the transactions set forth in this Agreement upon the terms and conditions set forth herein, including the Purchase Price as the same may be modified by the Buyer at the Auction.  Buyer's obligation to remain as the Next-Highest Bidder shall not terminate until the earlier of (i) the closing of the Alternative Transaction with the Successful Bidder, and (ii) the Outside Date.  Buyer and Seller acknowledge that time is of the essence in achieving Closing and shall undertake all commercially reasonable efforts to reach Closing in a timely manner.

(d)     Seller and Buyer will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry.

-29-

(e)    Seller shall:

(i)    [reserved];

(ii)    obtain entry by the Bankruptcy Court of the Sale Order by 11:59 p.m. prevailing Eastern time on or before January 19, 2024, or such other date as agreed by the parties; and

(iii)    consummate the Closing as promptly as practicable after entry of the Sale Order and the Sale Order becomes a Final Order, but in no event later than the Outside Date, unless otherwise agreed in writing by Buyer and Seller.

(f)    Seller will provide Buyer (in the event Buyer is the Successful Bidder or the Next-Highest Bidder) with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by Seller (including forms of Orders and notices to interested parties) prior to the filing thereof in either Bankruptcy Case. Seller shall use commercially reasonable efforts to obtain entry of the Sale Order. From and after the date hereof, and subject to the terms herein, Seller shall not take any action that is reasonably likely to result in, or fail to take any action that could reasonably likely result in, the reversal, voiding, modification or staying of the Sale Order.

(g)    If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from the Bid Procedures, the Bidding Procedures Order, or the Sale Order, Seller will promptly notify Buyer in writing of such appeal, petition, motion or stay request and Seller, with input from Buyer (if Buyer is the Successful Bidder or the Next-Highest Bidder), will take all reasonable steps to defend against such appeal, petition, motion or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer and Seller mutually waive in writing the condition to Closing that the Sale Order be a Final Order.

(h)    Seller and Buyer shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such Order by the Bankruptcy Court and upon the Sale Order becoming a Final Order).

6.13    Assumption & Rejection of Executory Contracts.

(a)    Schedule 6.13 (the "***Contract & Cure Schedule***") sets forth a list of all Contracts that Buyer has advised Seller it wants to assume and Seller to assign to Buyer under section 365 of the Bankruptcy Code and in accordance with Section 6.13(b) below. The Cure Claims in respect of each Contract based upon the most recent financial information available to

-30-

Seller will be set forth in the Contract & Cure Schedule. If Buyer is designated as the Successful Bidder or Next-Highest Bidder at the Auction, at any time prior to the Sale Hearing Date, Buyer, in its sole and absolute discretion, may amend the Contract & Cure Schedule to (i) add any Contract as an Assigned Contract provided that Buyer pays any applicable Cure Claims with respect to such newly added Assigned Contract on the Assignment Effective Date or (ii) remove any Contract (and be relieved of any obligation to pay any applicable Cure Claims with respect to such Contract), and provide notice to any counterparty to any additional Contract that will be an Assigned Contract shall be given by Seller in accordance with the notice and service provisions set forth in the Bid Procedures, the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Unless the Bankruptcy Court orders otherwise, each Contract included on the Contract & Cure Schedule will be deemed to have been assigned to Buyer and become an Assigned Contract on the date (the "***Assignment Effective Date***") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Contract or to a proposed Cure Claim.

(b)     No designation of any Contract for assumption and assignment in accordance with this Section 6.13, the Bid Procedures, the Bidding Procedures Order, or the Sale Order will give rise to any right to any adjustment to the Purchase Price; provided, however, for the avoidance of doubt, Buyer shall be responsible and liable for payment of any and all Cure Claims for any Assigned Contract.

6.14     Use of Intellectual Property Following Closing. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, from and after the Closing Date, the Debtors, Seller, and the Estates shall cease and discontinue any and all use or other exploitation of all Owned Intellectual Property purchased by Buyer; provided, however, that (a) Seller shall have the right on a royalty-free basis to continue to use the financial data for the purposes of filing tax returns and administering the Bankruptcy Cases and/or the Estates, which right shall terminate on the date on which each Bankruptcy Case is either dismissed or closed pursuant to a final decree or order of the Bankruptcy Court and (b) nothing in this Section 6.14 shall preclude the Seller from making any nominative fair use of the names "ViewRay, Inc." and "ViewRay Technologies, Inc.", including (i) in internal tax, legal, employment or similar records, (ii) as reasonably necessary and appropriate to describe the historical relationship of the Seller with the Purchased Assets or (iii) as required by applicable Law. Furthermore, Buyer shall, for a period of two (2) years from the Closing Date, permit Seller reasonable access to those Books and Records to the extent that access is required by Seller to file tax returns or administer the Bankruptcy Cases and/or the Estates.

6.15     Transfer of Governmental Authorizations.

(a)     From and after the date hereof, Sellers and Buyer shall reasonably cooperate (at Buyer's sole cost and expense) to transfer (to the extent transferable) to Buyer as of the Closing Date (or as soon as reasonably practicable thereafter) all Governmental Authorizations included in the Purchased Assets; provided, however, that any reasonable, documented out-of-pocket costs

-31-

associated with such cooperation by Seller after the Closing Date (including the *pro rata* portion of the costs of any employee, consultant or independent contractor directly providing such cooperation after the Closing Date, as determined by the amount of time dedicated by such employee, consultant or independent contractor to such cooperation as a proportion of all time dedicated by such employee, consultant or independent contractor to Sellers) shall be borne by Buyer.

(b)     In addition, no less than three (3) days prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Seller to maintain in effect any Governmental Authorization for up to three (3) months after the Closing for the purposes of passing through the benefits of such Governmental Authorization to Buyer, and (i) provided Buyer timely pays any costs associated with such Governmental Authorization, including any costs referred to in clause (iii) below, Seller shall use commercially reasonable efforts to maintain in effect such Governmental Authorization, (ii) Seller and Buyer shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of such Governmental Authorization to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer (including all statutory and other costs required to be paid or otherwise incurred in the Bankruptcy Cases, counsels' and other professionals' fees and expenses, to the extent such costs would not have been incurred but for this <u>Section 6.15</u>).

6.16    <u>Excluded Contracts; Consents</u>.

(a)     At any time prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Seller to maintain in effect any Excluded Contract or for up to three (3) months after the Closing for the purposes of passing through the benefits of such Excluded Contract to Buyer, and (i) provided Buyer timely pays in advance any costs associated with such Excluded Contract, including any costs referred to in clause (iii) below, Seller shall maintain in effect such Excluded Contract and not reject such Excluded Contract, (ii) Seller and Buyer shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of any such Excluded Contract to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer (including all statutory and other costs required to be paid or otherwise incurred in the Bankruptcy Cases, counsels' and other professionals' fees and expenses, to the extent such costs would not have been incurred but for this <u>Section 6.16</u>).

(b)     Notwithstanding any other provision of this Agreement, this Agreement does not effect an assignment of any Assigned Contract to the extent that such Assigned Contract is not assignable under the Bankruptcy Code without the consent of the other party or parties thereto, and the consent of such other party has not been given or received, as applicable, as of the Closing Date. As to any such Assigned Contract so designated in writing by Buyer, Seller and Buyer will use commercially reasonable efforts to obtain as promptly as practicable prior to and after the Closing, if necessary, the consent of the other parties to such Assigned Contract or, if required, novation thereof to Buyer or, alternatively, written confirmation from such parties

reasonably satisfactory to Seller and Buyer that such consent is not required. In no event, however, will Seller be obligated to pay any money to any Person or to offer or grant financial or other accommodations to any Person in connection with obtaining any consent, waiver, confirmation, novation or approval with respect to any such Assigned Contract. If any consent, waiver, confirmation, novation or approval is not obtained with respect to any such Assigned Contract, then to the extent permitted by applicable Law, Seller and Buyer will cooperate to establish an agency type or other similar arrangement reasonably satisfactory to Seller and Buyer under which Buyer would obtain (including by means of subcontracting, sublicensing or subleasing arrangement), to the extent practicable, all rights, and assume the corresponding Liabilities thereunder or under which Seller would enforce, for the benefit of Buyer, with Buyer assuming and agreeing to pay Seller's Liabilities and expenses, any and all rights of Seller against a Third Party to any such Assigned Contract. In such event (i) Seller will promptly pay to Buyer when received all moneys relating to the period on or after the Closing Date received by it under any Assigned Contract not transferred pursuant to this <u>Section 6.16(b)</u> and (ii) Buyer will promptly pay, perform or discharge when due any Liabilities arising thereunder after the Closing Date but not transferred to Buyer pursuant to this <u>Section 6.16(b)</u>. The failure by Buyer or Seller to obtain any required consent, waiver, confirmation, novation or approval with respect to any Assigned Contract will not relieve any party from its obligation to consummate at the Closing the transactions contemplated by this Agreement. Buyer acknowledges that no adjustment to the Purchase Price will be made for any such Assigned Contracts that are not assigned and that Buyer will have no claim against Seller in respect of any such unassigned Contracts.

6.17    <u>[Reserved]</u>.

6.18    <u>[Reserved]</u>

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    <u>Conditions to Obligations of All Parties</u>. The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver by both Buyer and Seller in writing, at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Seller and Buyer, and the Sale Order must be a Final Order.

(b)    No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions set forth in this Agreement and there must not be in effect any Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(c)     All filing and waiting periods applicable (including any extensions thereof) to the consummation of the transactions contemplated by this Agreement under any Antitrust Laws shall have expired or been terminated.

7.2     <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in <u>Article IV</u> of this Agreement shall be true and correct in all respects, at and as of the date hereof, and on the Closing Date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), with only such exceptions as do not have and would not reasonably be expected to have a Material Adverse Effect.

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; provided, however, that with respect to agreements, covenants and conditions that are qualified by materiality, Sellers shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Section 3.2(a)</u>.

(d)     Buyer shall have received a certificate, dated the Closing Date and signed by Seller that each of the conditions set forth in <u>Section 7.2(a)-7.2(c)</u> have been satisfied (the "***Sellers Closing Certificate***").

(e)     Since the date of this Agreement there shall not have occurred any Material Adverse Effect; provided that Buyer shall give written notice to Sellers within five (5) days of becoming aware of the occurrence of such Material Adverse Effect.

7.3     <u>Conditions to Obligations of Seller</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in <u>Article V</u> of this Agreement shall be true and correct in all respects at and as of the date hereof, and on the Closing Date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), with only such exceptions as do not have and would not reasonably be expected to have a material adverse effect on Seller or the transactions contemplated by this Agreement.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; provided, however, that with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     Buyer shall have delivered to Seller duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Sections 3.2(b).

(d)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, in such person's capacity as an officer and not in such person's individual capacity, that each of the conditions set forth in Section 7.3(a)-(c) and Section 7.2(e) have been satisfied (the "***Buyer Closing Certificate***").

## ARTICLE VIII

## TERMINATION

8.1     Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Sellers if:

(i)     Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Seller within five (5) Business Days of Sellers' receipt of written notice of such breach from Buyer;

(ii)     any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been, or if it becomes reasonably apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)     the Bankruptcy Cases are dismissed.

(c)     by Seller by written notice to Buyer if:

-35-

(i)     Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Seller; or

(ii)     any of the conditions set forth in (x) Section 7.1 or (y) Section 7.3 shall not have been, or if it becomes reasonably apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)     by Buyer or Seller by written notice to the other party if:

(i)     (x) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited, or (y) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable or will cause the Closing to occur or reasonably likely to occur after the Outside Date; or

(ii)     there is in effect an Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 8.1(d)(ii) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 8.1(d)(ii) occurring.

(e)     This Agreement shall terminate automatically (i) in the event that an Alternative Transaction has been consummated following approval by the Bankruptcy Court, or (ii) in the event that Buyer is not chosen at the Auction to be the Successful Bidder or the Next-Highest Bidder, in each case subject to Buyer's right to the refund of the Deposit in accordance with Section 2.5(h).

8.2     Effect of Termination. In the event of the termination of this Agreement in accordance with this Article VIII, this Agreement shall forthwith become void, and there shall be no Liability on the part of any party hereto except:

(a)     as set forth in this Article VIII and Section 2.5(d)-(h), and Section 6.12(c) hereof; and

-36-

(b)     that nothing herein shall relieve any party hereto from Liability to the other party for any willful breach of any provision hereof.

**ARTICLE IX**

**MISCELLANEOUS**

9.1     <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.2     <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt) with a copy by email; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested) with a copy by email; (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid with a copy by email. Notwithstanding anything to the contrary herein, any and all notices, requests, consents, claims, demands, waivers and other communications hereunder not otherwise transmitted by email shall additionally transmit such communications by email to any and all respective parties on the date such notice, request, consent, claim, demand, waiver, or other communication was otherwise transmitted (with confirmation of transmission). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 9.2</u>).

If to Seller:     George L. Miller, Chapter 7 Trustee
                  1628 John F. Kennedy Blvd., Suite 950
                  Philadelphia, PA 19103-2110

                  with a copy (that shall not constitute notice) to:

                  Bielli & Klauder, LLC
                  1204 N. King Street
                  Wilmington, DE 19801
                  Attention: David M. Klauder, Esq.
                  Email: <u>dklauder@bk-legal.com</u>

-37-

If to Buyer:

        MNP Holdings LLC
        c/o Seemorgh Investments, Inc.
        191 University Blvd.,  #246
        Denver, CO 80206
        Attention: Brad Nelson
        Email: bnelson@investments.com

        with a copy (that shall not constitute notice) to:

        Davis Graham & Stubbs LLP
        1550 Seventeenth Street, Suite 500
        Denver, CO 80202
        Attention: Wanda J. Abel; Adam Hirsch
        Email: wanda.abel@dgslaw.com; adam.hirsch@dgslaw.com

9.3    Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

9.4    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.5    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.6     Entire Agreement. This Agreement, including the Exhibits, the Schedules and the Ancillary Documents, the Bidding Procedures Order, and the Sale Order (once entered), if Buyer is the Successful Bidder, constitute the entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, and the Schedules, the statements in the body of this Agreement will control, except as otherwise provided in the Sale Order.

9.7     Assignment, Successors and No Third-Party Rights. This Agreement binds and benefits the parties and their respective successors and permitted assigns (including any trustee, receiver, receiver- manager, interim receiver or monitor or similar officer appointed in any respect of the Debtors or their Estates under chapter 11 or chapter 7 of the Bankruptcy Code and any Person appointed as a successor to Seller). No party may delegate any performance of its obligations under this Agreement, except that Buyer may at any time delegate its rights and the performance of its obligations to any Affiliate of Buyer so long as Buyer remains fully responsible for the performance of the delegated obligation. Buyer may designate one or more Affiliates, including any special purpose entities that may be organized by Buyer for the purpose of purchasing the Purchased Assets and assuming the Assumed Liabilities, or any portion thereof at closing, and upon written notice to Seller of any such designation by Buyer, Seller agrees that such designee of Buyer shall be deemed to be Buyer hereunder for all purposes and Seller further agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, Buyer's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this Section 9.7.

9.8     Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or Default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.9     Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT

-39-

APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

(b)    BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND (ii) THE PURCHASED ASSETS AND ASSUMED LIABILITIES, AND SELLERS AND BUYER EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.10    No Survival. The parties hereto, intending to modify any applicable statute of limitations, agree that (a) representations and warranties in this Agreement and in any Ancillary Document shall terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any claim be made by, any party hereto or any of its Affiliates in respect thereof, including any breach thereof, and (b) after the Closing, there shall be no liability on the part of, nor shall any claim be made by, any party hereto or any of its Affiliates in respect of any covenant or agreement to be performed prior to the Closing. All covenants and agreements contained in this Agreement that by their terms contemplate performance thereof following the Closing or otherwise expressly by their terms survive the Closing will survive the Closing in accordance with their terms. After the Closing, no party hereto may bring any Action seeking to rescind this Agreement or the transactions contemplated hereby, whether based on fraud, knowing or intentional misconduct, gross negligence, negligence, breach of contract, breach of statute, tort or otherwise.

## ARTICLE X

## COUNTERPARTS

10.1    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

GEORGE L. MILLER, AS CHAPTER 7
TRUSTEE OF THE ESTATES OF VIEWRAY,
INC. AND VIEWRAY TECHNOLOGIES, INC.

By:
Name: George L. Miller
Title: Chapter 7 Trustee

**BUYER:**

MNP HOLDINGS LLC

By:
Name: Bradford Nelson
Title: Manager and President

-41-
[Signature page to Asset Purchase Agreement]

## Schedule 2.1

### PERMITTED ENCUMBRANCES

Cure Claims identified on Schedule 6.13(a) with respect to contract #96 – Office Lease for 2 Thermo Fisher Way, Oakwood, Ohio 44146, dated April 17, 2008, by and between Cleveland Industrial Portfolio, LLC and ViewRay, Inc.

### Schedule 2.1(c)

### TANGIBLE PERSONAL PROPERTY

1.  MRIdian Systems, Free.Max Systems, and Associated Components
2.  All Manufacturing Equipment, Tools, Process and Documentation
3.  All Engineering Systems leased premises in Oakwood, Ohio
4.  All ViewRay Prototypes and Third-Party Development Units
5.  All System Production Inventory Including Raw Materials, Work-in-Progress and Finished Goods
6.  All System Spare Parts Inventory Including Raw Materials, Work-in-Progress and Finished Goods
7.  All Installation Tools Including Physical Tools, Hardware, and Software
8.  All Service Tools Including Physical Tools, Hardware, and Software
9.  All Engineering Tools Including Physical Tools, QA Tools, Testing Tools, Instrumentation, Hardware, and Software
10. All Office Furniture located in leased premises in Oakwood, Ohio
11. All Office Multimedia Devices, Televisions, Monitors, Video Conferencing Located in leased premises in Oakwood, Ohio
12. All Computers, Networking Hardware, & IT Infrastructure Located in leased premises in Oakwood, Ohio

## Schedule 2.1(d)

## LEASED REAL PROPERTY

Office Lease for 2 Thermo Fisher Way, Oakwood, Ohio 44146, dated April 17, 2008, by and between Cleveland Industrial Portfolio, LLC and ViewRay, Inc.

## Schedule 2.1(e)

## REGISTERED OWNED INTELLECTUAL PROPERTY

### ViewRay Intellectual Property - Granted Patents

**Notes**

501XXXXX docket numbers are licensed from the University of Florida.
533XXXXX docket numbers are jointly owned with Case Western Reserve Univ.
All other matters are owned solely by ViewRay.
This chart is current as of January 4, 2024.

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 501C01US | U.S.A. | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 12/609953 | 2010-0113911 | 8190233 | 30-Oct-2009 | 06-May-2010 | 29-May-2012 |
| 501C03US | U.S.A. | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 13/783084 | 2013-0245425 | 9114253 | 01-Mar-2013 | 19-Sep-2013 | 25-Aug-2015 |
| 501C04US | U.S.A. | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 14/807857 | 2016-0184609 | 9572999 | 23-Jul-2015 | 30-Jun-2016 | 21-Feb-2017 |
| 501C05US | U.S.A. | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 15/436620 | 2017-0203126 | 10688319 | 17-Feb-2017 | 20-Jul-2017 | 23-Jun-2020 |
| 501C06US | U.S.A. | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 16/900376 | 2020-0376298 | 11497937 | 12-Jun-2020 | 03-Dec-2020 | 15-Nov-2022 |
| 501D02CA | Canada | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 2974143 | 2974143 | 2974143 | 17-Feb-2005 | 01-Sep-2017 | 10-Nov-2020 |
| 501D02JP | Japan | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 2013-099232 | 2013-150876 | 5695124 | 08-Aug-2013 | 09-Sep-2005 | 13-Feb-2015 |
| 501D03JP | Japan | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 2014-200284 | 2014-240027 | 6615445 | 17-Feb-2005 | 15-Oct-2019 | 15-Nov-2019 |
| 501D05JP | Japan | System for Delivering Conformal Radiation Therapy While Simultaneously Imaging Soft Tissue (UF) | 2018-224559 | 2019-30773 | 6907177 | 17-Feb-2005 | 28-Feb-2019 | 02-Jul-2021 |
| 503C01US | U.S.A. | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 15/294533 | 2017-0032544 | 10055861 | 14-Oct-2016 | 02-Feb-2017 | 21-Aug-2018 |
| 503C02US | U.S.A. | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 16/105848 | 2019-0012814 | 10825209 | 20-Aug-2018 | 10-Jan-2019 | 03-Nov-2020 |
| 503D01CN | China | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 201610480024.0 | 106154192 | 201610480024 | 17-Jun-2010 | 23-Nov-2016 | 13-Oct-2020 |
| 503D02JP | Japan | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 2017-174583 | 2018-027313 | 6674421 | 17-Jun-2010 | 05-Feb-2020 | 10-Mar-2020 |
| 503D03JP | Japan | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 2020-038607 | 2020-103937 | 6899013 | 17-Jun-2010 | 09-Jul-2020 | 15-Nov-2021 |
| 503N01DE | Germany | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 10790211.6 | 2443590 | 2443590 | 17-Jun-2010 | 25-Apr-2012 | 14-Jun-2023 |
| 503N01FR | France | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 10790211.6 | 2443590 | 2443590 | 17-Jun-2010 | 25-Apr-2012 | 14-Jun-2023 |
| 503N01GB | United Kingdom | System and Method for Performing Tomographic Image Acquisition and Reconstruction | 10790211.6 | 2443590 | 2443590 | 17-Jun-2010 | 25-Apr-2012 | 14-Jun-2023 |
| 504C01US | U.S.A. | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 14/481619 | 2015-0065860 | 9421398 | 09-Sep-2014 | 05-Mar-2015 | 23-Aug-2016 |
| 504C02US | U.S.A. | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 15/212449 | 2017-0014644 | 10463883 | 19-Aug-2016 | 19-Jan-2017 | 05-Nov-2019 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 504C03US | U.S.A. | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 16362094 | 2019-0217126 | 10918887 | 22-Mar-2019 | 18-Jul-2019 | 16-Feb-2021 |
| 504C04US | U.S.A. | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 17174116 | US 2021-0162236 | 11452463 | 11-Feb-2021 | 03-Jun-2021 | 27-Sep-2022 |
| 504D01CN | China | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 201610115787.5 | 105664378 | 201610115787.5 | 15-Jul-2010 | 15-Jun-2016 | 28-Jun-2019 |
| 504D01JP | Japan | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 2015-059789 | 2015-134211 | 6224020 | 15-Jul-2010 | 05-Sep-2017 | 13-Oct-2017 |
| 504D02CN | China | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 201910479281.60 | 110201317 | 201910479281.6 | 15-Jul-2010 | 06-Sep-2019 | 23-Jul-2021 |
| 504D02JP | Japan | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 2017-193922 | 6462084 | 6462084 | 15-Jul-2010 | 27-Nov-2018 | 11-Jan-2019 |
| 504D03JP | Japan | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 2018-242820 | 2019-055289 | 6908579 | 15-Jul-2010 | 11-Apr-2019 | 05-Jul-2021 |
| 504D04JP | Japan | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 2021-110013 | 2021-164679 | 7072105 | 15-Jul-2010 | 14-Oct-2021 | 11-May-2022 |
| 501N01CA | Canada | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 2760055 | 2760055 | 2760055 | 15-Jul-2010 | 11-Jan-2012 | 06-Apr-2021 |
| 504N01DE | Germany | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 10800553.9 | 2454617 | 2454617 | 15-Jul-2010 | 06-Jan-2021 | 06-Jan-2021 |
| 504N01FR | France | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 10800553.9 | 2454617 | 2454617 | 15-Jul-2010 | 07-Jan-2021 | 06-Jan-2021 |
| 504N01GB | United Kingdom | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 10800553.9 | 2454617 | 2454617 | 15-Jul-2010 | 08-Jan-2021 | 06-Jan-2021 |
| 504N01IT | Italy | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 10800553.9 | 2454617 | 2454617 | 15-Jul-2010 | 09-Jan-2021 | 06-Jan-2021 |
| 504N01NL | Netherlands | Method and Apparatus for Shielding a Linear Accelerator and a Magnetic Resonance Imaging Device from Each Other | 10800553.9 | 2454617 | 2454617 | 15-Jul-2010 | 10-Jan-2021 | 06-Jan-2021 |
| 505001US | U.S.A. | Self-Shielded Split Gradient Coil | 12951976 | 2011-0121832 | 8896308 | 22-Nov-2010 | 26-May-2011 | 25-Nov-2014 |
| 505C01US | U.S.A. | Self-Shielded Split Gradient Coil | 14550464 | 2015-0077118 | 10132888 | 21-Nov-2014 | 19-Mar-2015 | 20-Nov-2018 |
| 505C02US | U.S.A. | Self-Shielded Split Gradient Coil | 16195673 | 2019-0219650 | 10823794 | 19-Nov-2018 | 18-Jul-2019 | 03-Nov-2020 |
| 505N01CA | Canada | Self-Shielded Split Gradient Coil | 2780647 | 2780647 | 2780647 | 22-Nov-2010 | 26-Jul-2012 | 22-Aug-2023 |
| 505N01CN | China | Self-Shielded Split Gradient Coil | 201080060989.5 | 102713682 | 201080060989.5 | 22-Nov-2010 | 03-Oct-2012 | 28-Jan-2015 |
| 505N01JP | Japan | Self-Shielded Split Gradient Coil | 2012-540133 | 2013-511361 | 5732065 | 22-Nov-2010 | 04-Apr-2013 | 17-Apr-2015 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 506C01US | U.S.A. | Split Magnetic Resonance Imaging System | 14/452416 | 2014-0347053 | 9423477 | 05-Feb-2014 | 27-Nov-2014 | 23-Aug-2016 |
| 506C02US | U.S.A. | Split Magnetic Resonance Imaging System | 15/242452 | 2016-0356869 | 10571536 | 19-Aug-2016 | 08-Dec-2016 | 25-Feb-2020 |
| 506D01CN | China | Split Magnetic Resonance Imaging System | 201610702391.0 | 106388823 | 201610702391.0 | 24-Feb-2011 | 15-Feb-2017 | 29-Nov-2019 |
| 506D01DE | Germany | Split Magnetic Resonance Imaging System | 191166735.1 | 3572823 | 3572823 | 24-Feb-2011 | 27-Nov-2019 | 06-Apr-2022 |
| 506D01FR | France | Split Magnetic Resonance Imaging System | 191166735.1 | 3572823 | 3572823 | 24-Feb-2011 | 27-Nov-2019 | 06-Apr-2022 |
| 506D01GB | United Kingdom | Split Magnetic Resonance Imaging System | 191166735.1 | 3572823 | 3572823 | 24-Feb-2011 | 27-Nov-2019 | 06-Apr-2022 |
| 506D01IT | Italy | Split Magnetic Resonance Imaging System | 191166735.1 | 3572823 | 3572823 | 24-Feb-2011 | 27-Nov-2019 | 06-Apr-2022 |
| 506D01JP | Japan | Split Magnetic Resonance Imaging System | 2015-203963 | 2016-039917 | 6377033 | 24-Feb-2011 | 24-Mar-2016 | 03-Aug-2018 |
| 506D01NL | Netherlands | Split Magnetic Resonance Imaging System | 191166735.1 | 3572823 | 3572823 | 24-Feb-2011 | 27-Nov-2019 | 06-Apr-2022 |
| 506N01CA | Canada | Split Magnetic Resonance Imaging System | 2790572 | 2790572 | 2790572 | 24-Feb-2011 | 12-Oct-2012 | 07-May-2019 |
| 506N01DE | Germany | Split Magnetic Resonance Imaging System | 11748064.0 | 2538840 | 2538840 | 24-Feb-2011 | 02-Jan-2013 | 03-Apr-2019 |
| 506N01FR | France | Split Magnetic Resonance Imaging System | 11748064.0 | 2538840 | 2538840 | 24-Feb-2011 | 02-Jan-2013 | 03-Apr-2019 |
| 506N01GB | United Kingdom | Split Magnetic Resonance Imaging System | 11748064.0 | 2538840 | 2538840 | 24-Feb-2011 | 02-Jan-2013 | 03-Apr-2019 |
| 545001WO | Italy | Split Magnetic Resonance Imaging System | 11748064.0 | 2538840 | 2538840 | 24-Feb-2011 | 02-Jan-2013 | 03-Apr-2019 |
| 506N01NL | Netherlands | Split Magnetic Resonance Imaging System | 11748064.0 | 2538840 | 2538840 | 24-Feb-2011 | 02-Jan-2013 | 03-Apr-2019 |
| 546001WO | U.S.A. | System and Method for Image Guidance During Medical Procedures | 13/333726 | 2012-0165652 | 8812077 | 21-Dec-2011 | 28-Jun-2012 | 19-Aug-2014 |
| 508D01CN | China | System and Method for Image Guidance During Medical Procedures | 201710181222.1 | 107126634 | 201710181222.1 | 21-Dec-2011 | 05-Sep-2017 | 27-Apr-2021 |
| 508D01DE | Germany | System and Method for Image Guidance During Medical Procedures | 17000759.5 | 3266381 | 3266381 | 21-Dec-2011 | 10-Jan-2018 | 05-Jan-2022 |
| 508D01FR | France | System and Method for Image Guidance During Medical Procedures | 17000759.5 | 3266381 | 3266381 | 21-Dec-2011 | 10-Jan-2018 | 05-Jan-2022 |
| 508D01GB | United Kingdom | System and Method for Image Guidance During Medical Procedures | 17000759.5 | 3266381 | 3266381 | 21-Dec-2011 | 10-Jan-2018 | 05-Jan-2022 |
| 508D01IT | Italy | System and Method for Image Guidance During Medical Procedures | 17000759.5 | 3266381 | 3266381 | 21-Dec-2011 | 10-Jan-2018 | 05-Jan-2022 |
| 508D01NL | Netherlands | System and Method for Image Guidance During Medical Procedures | 17000759.5 | 3266381 | 3266381 | 21-Dec-2011 | 10-Jan-2018 | 05-Jan-2022 |
| 508D02JP | Japan | System and Method for Image Guidance During Medical Procedures | 2018-229690 | 2019-069169 | 6774481 | 21-Dec-2011 | 23-Sep-2020 | 06-Oct-2020 |
| 508N01CN | China | System and Method for Image Guidance During Medical Procedures | 201180062596.2 | 103281968 | 201180062596.2 | 21-Dec-2011 | 04-Sep-2013 | 12-Apr-2017 |
| 508N01DE | Germany | System and Method for Image Guidance During Medical Procedures | 11850577.5 | 2654574 | 2654574 | 21-Dec-2011 | 30-Oct-2013 | 03-May-2017 |
| 508N01FR | France | System and Method for Image Guidance During Medical Procedures | 11850577.5 | 2654574 | 2654574 | 21-Dec-2011 | 30-Oct-2013 | 03-May-2017 |
| 508N01GB | United Kingdom | System and Method for Image Guidance During Medical Procedures | 11850577.5 | 2654574 | 2654574 | 21-Dec-2011 | 30-Oct-2013 | 03-May-2017 |
| 508N01IT | Italy | System and Method for Image Guidance During Medical Procedures | 11850577.5 | 2654574 | 2654574 | 21-Dec-2011 | 30-Oct-2013 | 03-May-2017 |
| 508N01NL | Netherlands | System and Method for Image Guidance During Medical Procedures | 11850577.5 | 2654574 | 2654574 | 21-Dec-2011 | 30-Oct-2013 | 03-May-2017 |
| 509C02US | U.S.A. | Active Resistive Shimming for MRI Devices | 15/449774 | 2017-0176556 | 10393836 | 03-Mar-2017 | 22-Jun-2017 | 27-Aug-2019 |
| 509D01CN | China | Active Resistive Shimming for MRI Devices | 201710417106.50 | 107304680 | 201710417106.5 | 11-Dec-2012 | 27-Oct-2017 | 01-Jan-2021 |
| 509D01JP | Japan | Active Resistive Shimming for MRI Devices | 2017-227844 | 2018-075383 | 6650430 | 11-Dec-2012 | 17-May-2018 | 22-Jan-2020 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 509F01US | U.S.A. | Active Resistive Shimming for MRI Devices | 13/324850 | 2013-0147476 | 8981779 | 13-Dec-2011 | 13-Jun-2013 | 17-Mar-2015 |
| 509N01CN | China | Active Resistive Shimming for MRI Devices | 201280069285.3 | 104204837 | 201280069285.3 | 11-Dec-2012 | 10-Dec-2014 | 20-Jun-2017 |
| 509N01DE | Germany | Active Resistive Shimming for MRI Devices | 12813621.5 | 2791694 | 2791694 | 11-Dec-2012 | 22-Oct-2014 | 14-Apr-2021 |
| 509N01FR | France | Active Resistive Shimming for MRI Devices | 12813621.5 | 2791694 | 2791694 | 11-Dec-2012 | 22-Oct-2014 | 14-Apr-2021 |
| 509N01GB | United Kingdom | Active Resistive Shimming for MRI Devices | 12813621.5 | 2791694 | 2791694 | 11-Dec-2012 | 22-Oct-2014 | 14-Apr-2021 |
| 509N01IT | Italy | Active Resistive Shimming for MRI Devices | 12813621.5 | 2791694 | 2791694 | 11-Dec-2012 | 22-Oct-2014 | 14-Apr-2021 |
| 509N01JP | Japan | Active Resistive Shimming for MRI Devices | 2014-547337 | 2015-500127 | 6253592 | 11-Dec-2012 | 05-Jan-2015 | 08-Dec-2017 |
| 509N01NL | Netherlands | Active Resistive Shimming for MRI Devices | 12813621.5 | 2791694 | 2791694 | 11-Dec-2012 | 22-Oct-2014 | 14-Apr-2021 |
| 510D01CA | Canada | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 3124185 | 3124185 | 3124185 | 11-Mar-2014 | 24-Aug-2021 | 29-Aug-2023 |
| 510D01CN | China | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 201810428599.70 | 108992795 | 201810428599.7 | 11-Mar-2014 | 14-Dec-2018 | 19-Feb-2021 |
| 510D01DE | Germany | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 17020028.3 | 3360599 | 3360599 | 11-Mar-2014 | 15-Aug-2018 | 06-May-2020 |
| 510D01FR | France | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 17020028.3 | 3360599 | 3360599 | 11-Mar-2014 | 15-Aug-2018 | 06-May-2020 |
| 510D01GB | United Kingdom | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 17020028.3 | 3360599 | 3360599 | 11-Mar-2014 | 15-Aug-2018 | 06-May-2020 |
| 510D01IT | Italy | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 17020028.3 | 3360599 | 3360599 | 11-Mar-2014 | 15-Aug-2018 | 06-May-2020 |
| 510D01JP | Japan | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 2018-199909 | 2019-030716 | 6791928 | 11-Mar-2014 | 28-Feb-2019 | 09-Nov-2020 |
| 510D01NL | Netherlands | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 17020028.3 | 3360599 | 3360599 | 11-Mar-2014 | 15-Aug-2018 | 06-May-2020 |
| 510F01US | U.S.A. | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 13/801680 | 2014-0275963 | 9675271 | 13-Mar-2013 | 18-Sep-2014 | 13-Jun-2017 |
| 510N01CA | Canada | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 2904603 | 2904603 | 2904603 | 11-Mar-2014 | 04-Nov-2015 | 24-Aug-2021 |
| 510N01CN | China | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 201480014312.7 | 105188846 | 201480014312.7 | 11-Mar-2014 | 23-Dec-2015 | 29-May-2018 |
| 510N01DE | Germany | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 14720746.8 | 2968978 | 2968978 | 11-Mar-2014 | 20-Jan-2016 | 27-Dec-2017 |
| 510N01FR | France | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 14720746.8 | 2968978 | 2968978 | 11-Mar-2014 | 20-Jan-2016 | 27-Dec-2017 |
| 510N01GB | United Kingdom | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 14720746.8 | 2968978 | 2968978 | 11-Mar-2014 | 20-Jan-2016 | 27-Dec-2017 |
| 510N01IT | Italy | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 14720746.8 | 2968978 | 2968978 | 11-Mar-2014 | 20-Jan-2016 | 27-Dec-2017 |
| 510N01NL | Netherlands | Systems And Methods For Radiotherapy With Magnetic Resonance Imaging | 14720746.8 | 2968978 | 2968978 | 11-Mar-2014 | 20-Jan-2016 | 27-Dec-2017 |
| 511F01US | U.S.A. | Videographic Display of Real-Time Medical Treatment | 13/462750 | 2013-0296687 | 10561861 | 02-May-2012 | 07-Nov-2013 | 18-Feb-2020 |
| 513001US | U.S.A. | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 14/064053 | 2014-0121495 | 9889318 | 25-Oct-2013 | 01-May-2014 | 13-Feb-2018 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 513C01US | U.S.A. | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 15/851543 | 2018-0133511 | 10835763 | 21-Dec-2017 | 17-May-2018 | 17-Nov-2020 |
| 513C02US | U.S.A. | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 16/116187 | 2019-0022413 | 10821303 | 29-Aug-2018 | 24-Jan-2019 | 03-Nov-2020 |
| 513C03US | U.S.A. | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 16/116312 | 2019-0022414 | 11040222 | 29-Aug-2018 | 24-Jan-2019 | 22-Jun-2021 |
| 513D01CN | China | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 201810196126.9 | 108452443 | 201810196126.9 | 25-Oct-2013 | 28-Aug-2018 | 18-May-2021 |
| 513D01JP | Japan | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 2018-145226 | 2018-192281 | 6791915 | 25-Oct-2013 | 06-Dec-2018 | 09-Nov-2020 |
| 513N01CN | China | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 201380068528.6 | 104902956 | 201380068528.6 | 25-Oct-2013 | 09-Sep-2015 | 03-Apr-2018 |
| 513N01DE | Germany | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 13789652.8 | 2911745 | 2911745 | 25-Oct-2013 | 02-Sep-2015 | 07-Aug-2019 |
| 513N01FR | France | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 2911745 | 2911745 | 2911745 | 25-Oct-2013 | 02-Sep-2015 | 07-Aug-2019 |
| 513N01GB | United Kingdom | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 13789652.8 | 2911745 | 2911745 | 25-Oct-2013 | 02-Sep-2015 | 07-Aug-2019 |
| 513N01IT | Italy | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 13789652.8 | 2911745 | 2911745 | 25-Oct-2013 | 02-Sep-2015 | 07-Aug-2019 |
| 513N01JP | Japan | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 2015-539874 | 2015-533581 | 6382208 | 25-Oct-2013 | 26-Nov-2015 | 10-Aug-2018 |
| 513N01NL | Netherlands | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | 13789652.8 | 2911745 | 2911745 | 25-Oct-2013 | 02-Sep-2015 | 07-Aug-2019 |
| 515C01US | U.S.A. | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 15/268366 | 2017-0001039 | 10463884 | 16-Sep-2016 | 05-Jan-2017 | 05-Nov-2019 |
| 515C02US | U.S.A. | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 16/598564 | 2020-0038688 | 11083912 | 10-Oct-2019 | 06-Feb-2020 | 10-Aug-2021 |
| 515C03US | U.S.A. | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17/397214 | 2021-0361973 | 11612764 | 9-Aug-2021 | 25-Nov-2021 | 28-Mar-2023 |
| 515D01CN | China | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 201810580270.2 | 105073192 | 201810580270.2 | 14-Mar-2014 | 21-Dec-2018 | 15-Sep-2020 |
| 515D01DE | Germany | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17000760.3 | 3266500 | 3266500 | 14-Mar-2014 | 10-Jan-2018 | 26-Oct-2022 |
| 515D01FR | France | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17000760.3 | 3266500 | 3266500 | 14-Mar-2014 | 10-Jan-2018 | 26-Oct-2022 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 515D01GB | United Kingdom | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17000760.3 | 3266500 | 3266500 | 14-Mar-2014 | 10-Jan-2018 | 26-Oct-2022 |
| 515D01IT | Italy | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17000760.3 | 3266500 | 3266500 | 14-Mar-2014 | 10-Jan-2018 | 26-Oct-2022 |
| 515D01JP | Japan | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 2019-160762 | 2020-011078 | 6929329 | 14-Mar-2014 | 23-Jan-2020 | 12-Aug-2021 |
| 515D01NL | Netherlands | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 17000760.3 | 3266500 | 3266500 | 14-Mar-2014 | 10-Jan-2018 | 26-Oct-2022 |
| 515F01US | U.S.A. | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 13/841478 | 2014-0266208 | 9446263 | 15-Mar-2013 | 18-Sep-2014 | 20-Sep-2016 |
| 515N01CA | Canada | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 2905088 | 2905088 | 2905088 | 14-Mar-2014 | 19-Nov-2015 | 11-Jul-2023 |
| 515N01CN | China | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 201480014817.2 | 105073192 | 201480014817.2 | 14-Mar-2014 | 18-Nov-2015 | 06-Jul-2018 |
| 515N01DE | Germany | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 14717949.3 | 2968977 | 2968977 | 14-Mar-2014 | 20-Jan-2016 | 03-May-2017 |
| 515N01FR | France | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 14717949.3 | 2968977 | 2968977 | 14-Mar-2014 | 20-Jan-2016 | 03-May-2017 |
| 515N01GB | United Kingdom | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 14717949.3 | 2968977 | 2968977 | 14-Mar-2014 | 20-Jan-2016 | 03-May-2017 |
| 515N01IT | Italy | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 14717949.3 | 2968977 | 2968977 | 14-Mar-2014 | 20-Jan-2016 | 03-May-2017 |
| 515N01JP | Japan | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 2016-502898 | 2016-513560 | 6584385 | 14-Mar-2014 | 16-May-2016 | 13-Sep-2019 |
| 515N01NL | Netherlands | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | 14717949.3 | 2968977 | 2968977 | 14-Mar-2014 | 20-Jan-2016 | 03-May-2017 |
| 516C01US | U.S.A. | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 15/224264 | 2017-0052236 | 10466319 | 29-Jul-2016 | 23-Feb-2017 | 05-Nov-2019 |
| 516C02US | U.S.A. | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 16/509346 | 2019-0331746 | 11035916 | 11-Jul-2019 | 31-Oct-2019 | 15-Jun-2021 |
| 516D01CN | China | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 202010069533.0 | 111257808 | ZL202010069533.0 | 12-Mar-2014 | 09-Jun-2020 | 18-Oct-2022 |
| 516D01JP | Japan | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 2019-071024 | JP 2019-130366 | 7085514 | 12-Mar-2014 | 08-Aug-2019 | 08-Jun-2022 |
| 516F01US | U.S.A. | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 13/796784 | 2014-0266206 | 9404983 | 12-Mar-2013 | 18-Sep-2014 | 02-Aug-2016 |
| 516N01DE | Germany | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 14714116.2 | 2972448 | 2972448 | 12-Mar-2014 | 20-Jan-2016 | 03-May-2023 |
| 516N01FR | France | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 14714116.2 | 2972448 | 2972448 | 12-Mar-2014 | 20-Jan-2016 | 03-May-2023 |
| 516N01GB | United Kingdom | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 14714116.2 | 2972448 | 2972448 | 12-Mar-2014 | 20-Jan-2016 | 03-May-2023 |
| 516N01JP | Japan | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | 2016-501503 | 2016-512464 | 6509803 | 12-Mar-2014 | 28-Apr-2016 | 12-Apr-2019 |
| 517001US | U.S.A. | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 14/559880 | 2015-0154756 | 10026186 | 03-Dec-2014 | 04-Jun-2015 | 17-Jul-2018 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 517C01US | U.S.A. | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 16/036701 | 2019-0066309 | 10650532 | 16-Jul-2018 | 28-Feb-2019 | 12-May-2020 |
| 517D01CN | China | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 201910522025.0 | 110136176 | 2019105220250 | 03-Dec-2014 | 16-Aug-2019 | 09-Dec-2022 |
| 517D01JP | Japan | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 2019-172511 | 2020-035449 | 6884834 | 03-Dec-2014 | 05-Mar-2020 | 14-May-2021 |
| 517D02JP | Japan | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 2021-081330 | 2021-118930 | 7203895 | 03-Dec-2014 | 12-Aug-2021 | 04-Jan-2023 |
| 517N01CA | Canada | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 2932259 | 2932259 | 2932259 | 03-Dec-2014 | 20-Jun-2016 | 28-Mar-2023 |
| 517N01CN | China | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | 201480073644.1 | 106415658 | 201480073644.1 | 03-Dec-2014 | 15-Feb-2017 | 12-Jul-2019 |
| 518C01US | U.S.A. | Magnetic Resonance Imaging Receive Coil Assembly | 17/346062 | 2021-0298630 | 11642040 | 11-Jun-2021 | 30-Sep-2021 | 09-May-2023 |
| 518F01US | U.S.A. | Magnetic Resonance Imaging Recieve Coil Assembly | 14/555205 | 2016-0146911 | 11045108 | 26-Nov-2014 | 26-May-2016 | 29-Jun-2021 |
| 520001US | U.S.A. | Magnetic Field Compensation In A Linear Accelerator | 15/450666 | 2017-0265290 | 10021774 | 06-Mar-2017 | 14-Sep-2017 | 10-Jul-2018 |
| 521001US | U.S.A. | Radiotherapy Systems, Methods And Software | 16/204838 | 2019-0168028 | 11033758 | 29-Nov-2018 | 06-Jun-2019 | 15-Jun-2021 |
| 521N01CN | China | Radiotherapy Methods, System, And Software | 201880088672.9 | 111712298 | 111712298 | 29-Nov-2018 | 25-Sep-2020 | 04-Apr-2023 |
| 521N01JP | Japan | Radiotherapy Methods, System, And Software | 2020-530330 | 2021-505243 | 7127126 | 29-Nov-2018 | 18-Feb-2021 | 19-Aug-2022 |
| 522001US | U.S.A. | Magnetic Resonance Imaging At Low Field Strength | 15/630890 | US 2017-0371001 | 11378629 | 22-Jun-2017 | 28-Dec-2017 | 05-Jul-2022 |
| 522C02US | U.S.A. | Magnetic Resonance Imaging At Low Field Strength | 17/848287 | 2022-0334199 | 11768257 | 23-Jun-2022 | 20-Oct-2022 | 26-Sep-2023 |
| 522N01CN | China | Magnetic Resonance Imaging At Low Field Strength | 201780051306.1 | 109612933 | ZL 201780051306.1 | 22-Jun-2017 | 16-Apr-2019 | 06-Sep-2022 |
| 522N01JP | Japan | Magnetic Resonance Imaging At Low Field Strength | 2018-567083 | 2019-524193 | 7098539 | 22-Jun-2017 | 9//2019 | 01-Jul-2022 |
| 523C01US | U.S.A. | Planning and Control for Magnetic Resonance Guided Radiation Therapy | 16/166572 | 2019-0175943 | 10888714 | 22-Oct-2018 | 13-Jun-2019 | 12-Jan-2021 |
| 523C02US | U.S.A. | Planning And Control For Magnetic Resonance Guided Radiation Therapy | 17/143885 | 2021-0146160 | 11628314 | 7-Jan-2021 | 20-May-2021 | 18-Apr-2023 |
| 523N01CN | China | Planning and Control for Magnetic Resonance Guided Radiation Therapy | 201680017015.6 | 107427691 | 201680017015.6 | 11-Feb-2016 | 01-Dec-2017 | 27-Oct-2020 |
| 523N01DE | Germany | Planning And Control For Magnetic Resonance Guided Radiation Therapy | 16708028.2 | 3256215 | 3256215 | 11-Feb-2016 | 20-Dec-2017 | 04-Oct-2023 |
| 523N01FR | France | Planning And Control For Magnetic Resonance Guided Radiation Therapy | 16708028.2 | 3256215 | 3256215 | 11-Feb-2016 | 20-Dec-2017 | 04-Oct-2023 |
| 523N01GB | United Kingdom | Planning And Control For Magnetic Resonance Guided Radiation Therapy | 16708028.2 | 3256215 | 3256215 | 11-Feb-2016 | 20-Dec-2017 | 04-Oct-2023 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 523N01JP | Japan | Planning and Control for Magnetic Resonance Guided Radiation Therapy | 2017-542112 | 2018-508277 | 6893876 | 11-Feb-2016 | 29-Mar-2018 | 04-Jun-2021 |
| 523N01NL | Netherlands | Planning And Control For Magnetic Resonance Guided Radiation Therapy | 16708028.2 | 3256215 | 3256215 | 11-Feb-2016 | 20-Dec-2017 | 04-Oct-2023 |
| 524001US | U.S.A. | Ion Chamber For Radiation Measurement | 15/217887 | 2017-0021198 | 10183181 | 22-Jul-2016 | 19-May-2017 | 22-Jan-2019 |
| 524C01US | U.S.A. | Ion Chamber For Radiation Measurement | 16/252305 | 2019-0240511 | 10821304 | 18-Jan-2019 | 08-Aug-2019 | 03-Nov-2020 |
| 524C02US | U.S.A. | Ion Chamber For Radiation Measurement | 17/085938 | 2021-0162238 | 11224764 | 30-Oct-2020 | 03-Jun-2021 | 18-Jan-2022 |
| 524N01CN | China | Ion Chamber For Radiation Measurement | 201680047622.7 | 108027445 | ZL201680047622.7 | 22-Jul-2016 | 11-May-2018 | 11-May-2018 |
| 524N01JP | Japan | Ion Chamber For Radiation Measurement | 2018-502740 | 2018-522381 | 7014707 | 22-Jul-2016 | 09-Aug-2018 | 24-Jan-2022 |
| 527001US | U.S.A. | Magnetic Resonance Volumetric Imaging | 15/638255 | US 2017-0367612 | 11284811 | 20-Jun-2017 | 28-Dec-2017 | 29-Mar-2022 |
| 527D01JP | Japan | Magnetic Resonance Volumetric Imaging | 2022-144956 | 2022-174220 | 7318083 | 22-Jun-2016 | 22-Nov-2022 | 21-Jul-2023 |
| 527N01CN | China | Magnetic Resonance Volumetric Imaging | 201780051416.8 | 109642934 | 201780051416.8 | 21-Jun-2017 | 16-Apr-2019 | 29-Oct-2021 |
| 527N01DE | Germany | Magnetic Resonance Volumetric Imaging | 17734923.0 | 3475719 | 3475719 | 21-Jun-2017 | 01-May-2019 | 28-Jul-2021 |
| 527N01FR | France | Magnetic Resonance Volumetric Imaging | 17734923.0 | 3475719 | 3475719 | 21-Jun-2017 | 01-May-2019 | 28-Jul-2021 |
| 527N01GB | United Kingdom | Magnetic Resonance Volumetric Imaging | 17734923.0 | 3475719 | 3475719 | 21-Jun-2017 | 01-May-2019 | 28-Jul-2021 |
| 527N01IT | Italy | Magnetic Resonance Volumetric Imaging | 17734923.0 | 3475719 | 3475719 | 21-Jun-2017 | 01-May-2019 | 28-Jul-2021 |
| 527N01JP | Japan | Magnetic Resonance Volumetric Imaging | 2018-567084 | 2019-520142 | 7142580 | 21-Jun-2017 | 18-Jul-2019 | 15-Sep-2022 |
| 527N01NL | Netherlands | Magnetic Resonance Volumetric Imaging | 17734923.0 | 3475719 | 3475719 | 21-Jun-2017 | 01-May-2019 | 28-Jul-2021 |
| 528001US | U.S.A. | Particle Therapy With Magnetic Resonance Imaging | 15/445832 | 2017-0252577 | 10413751 | 28-Feb-2017 | 07-Sep-2017 | 17-Sep-2019 |
| 528C01US | U.S.A. | Particle Therapy With Magnetic Resonance Imaging | 16/570810 | US 2020-0001115 | 11351398 | 13-Sep-2019 | 02-Jun-2020 | 07-Jun-2022 |
| 528N01DE | Germany | Particle Therapy With Magnetic Resonance Imaging | 17711417.0 | 3423153 | 3423153 | 28-Feb-2017 | 09-Jan-2019 | 19-May-2021 |
| 528N01FR | France | Particle Therapy With Magnetic Resonance Imaging | 17711417.0 | 3423153 | 3423153 | 28-Feb-2017 | 09-Jan-2019 | 19-May-2021 |
| 528N01GB | United Kingdom | Particle Therapy With Magnetic Resonance Imaging | 17711417.0 | 3423153 | 3423153 | 28-Feb-2017 | 09-Jan-2019 | 19-May-2021 |
| 528N01IT | Italy | Particle Therapy With Magnetic Resonance Imaging | 17711417.0 | 3423153 | 3423153 | 28-Feb-2017 | 09-Jan-2019 | 19-May-2021 |
| 528N01JP | Japan | Particle Therapy With Magnetic Resonance Imaging | 2018-545646 | 2019-506972 | 7066621 | 28-Feb-2017 | 14-Mar-2019 | 02-May-2022 |
| 528N01NL | Netherlands | Particle Therapy With Magnetic Resonance Imaging | 17711417.0 | 3423153 | 3423153 | 28-Feb-2017 | 09-Jan-2019 | 19-May-2021 |
| 529001US | U.S.A. | Reduction of Artifacts in Magnetic Resonance Imaging | 15/933288 | US 2018-0275238 | 11353535 | 22-Mar-2018 | 27-Sep-2018 | 07-Jun-2022 |
| 532001US | U.S.A. | Radiation Therapy Systems And Methods | 15/840941 | 2018-0161602 | 11000706 | 13-Dec-2017 | 14-Jun-2018 | 11-May-2021 |
| 532D01EP | European Patent Office | Radiation Therapy Systems And Methods | 21151955.8 | 3827883 | 3827883 | 13-Dec-2017 | 21-Jul-2021 | 15-Nov-2023 |
| 532N01DE | Germany | Radiation Therapy Systems And Methods | 17822532.2 | 3554635 | 3554635 | 13-Dec-2017 | 23-Oct-2019 | 20-Jan-2021 |
| 532N01FR | France | Radiation Therapy Systems And Methods | 17822532.2 | 3554635 | 3554635 | 13-Dec-2017 | 23-Oct-2019 | 20-Jan-2021 |
| 532N01GB | United Kingdom | Radiation Therapy Systems And Methods | 17822532.2 | 3554635 | 3554635 | 13-Dec-2017 | 23-Oct-2019 | 20-Jan-2021 |
| 532N01IT | Italy | Radiation Therapy Systems And Methods | 17822532.2 | 3554635 | 3554635 | 13-Dec-2017 | 23-Oct-2019 | 20-Jan-2021 |
| 532N01NL | Netherlands | Radiation Therapy Systems And Methods | 17822532.2 | 3554635 | 3554635 | 13-Dec-2017 | 23-Oct-2019 | 20-Jan-2021 |
| 533D01US | U.S.A. | Optimized RF Shield Design (CWRU) | 14/685021 | 2015-0212174 | 10557902 | 13-Apr-2015 | 30-Jul-2015 | 11-Feb-2020 |
| 538001US | U.S.A. | Resistive Electromagnet Systems And Methods | 16/179764 | 2019-0353725 | 11209509 | 02-Nov-2018 | 21-Nov-2019 | 28-Dec-2021 |

| Dkt. Num. | Country | Title | AppNumber | PubNumber | PatNumber | FileDate | PubDate | IssDate |
|---|---|---|---|---|---|---|---|---|
| 538N01JP | Japan | Resistive Electromagnet Systems And Methods | 2020-563985 | 2021-527459 | 7383643 | 5-Nov-2018 | 14-Oct-2021 | 10-Nov-2023 |
| 539001US | U.S.A. | Multi Level Multileaf Collimators (Varian) | 12/861368 | 2012-0043482 | 8637841 | 23-Aug-2010 | 23-Feb-2012 | 28-Jan-2014 |
| 539C01US | U.S.A. | Multi Level Multileaf Collimators (Varian) | 14/144509 | 2014-0112453 | 9082520 | 30-Dec-2013 | 24-Apr-2014 | 14-Jul-2015 |
| 539N01CN | China | Multi Level Multileaf Collimators (Varian) | 201180042837 | 103079643 | 103079643 | 18-Aug-2011 | 01-May-2013 | 01-Mar-2016 |

-12-

# ViewRay Intellectual Property - Pending Applications

**Notes**
501XXXXX docket numbers are licensed from the University of Florida.
All other matters are owned solely by ViewRay.
This chart is current as of January 4, 2024.

| Dkt. Num. | Country | Title | Status | AppNumber | PubNumber | FileDate |
|---|---|---|---|---|---|---|
| 504C05US | U.S.A. | Method And Apparatus For Shielding A Linear Accelerator And A Magnetic Resonance Imaging Device From Each Other | Published | 17/948428 | 2023-0017149 | 20-Sep-2022 |
| 504D01CA | Canada | Method And Apparatus For Shielding A Linear Accelerator And A Magnetic Resonance Imaging Device From Each Other | Allowed | 3090069 | 3090069 | 15-Jul-2010 |
| 504D02CA | Canada | Method And Apparatus For Shielding A Linear Accelerator And A Magnetic Resonance Imaging Device From Each Other | Pending | 3198109 | | 27-Apr-2023 |
| 504D05JP | Japan | Method And Apparatus For Shielding A Linear Accelerator And A Magnetic Resonance Imaging Device From Each Other | Allowed | 2022-077042 | 2022-110046 | 15-Jul-2010 |
| 505C03US | U.S.A. | Self-Shielded Split Gradient Coil | Published | 17/086037 | 2021-0096198 | 30-Oct-2020 |
| 513C04US | U.S.A. | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | Published | 17/346109 | 2021-0308488 | 11-Jun-2021 |
| 513D01EP | European Patent Office | Assessment And Improvement of Treatment Using Imaging of Physiological Responses to Radiation Therapy | Published | 19190375.6 | 3628370 | 25-Oct-2013 |
| 515D01CA | Canada | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | Pending | 3192368 | | 14-Mar-2014 |
| 515D02EP | European Patent Office | Systems And Methods For Linear Accelerator Radiotherapy With Magnetic Resonance Imaging | Published | 22203401.9 | 4140539 | 11-Mar-2014 |
| 516C05US | U.S.A. | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | Published | 17/344825 | 2021-0356539 | 10-Jun-2021 |
| 516D01EP | European Patent Office | Radio Frequency Transmit Coil For Magnetic Resonance Imaging System | Published | 23164774.4 | 4220213 | 12-Mar-2014 |
| 517C02US | U.S.A. | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | Published | 16/865145 | 2020-0258238 | 1-May-2020 |
| 517D01CA | Canada | Single- And Multi-Modality Alignment Of Medical Images In The Presence Of Non-Rigid Deformations Using Phase Correlation | Published | 3187156 | 3187156 | 3-Dec-2014 |
| 521D01CN | China | Radiotherapy Methods, System, And Software | Published | 202310263048.0 | 116036499 | 29-Nov-2018 |
| 521D01JP | Japan | Radiotherapy Methods, System, And Software | Allowed | 2022-129939 | 2022-166206 | 29-Nov-2018 |
| 521N01EP | European Patent Office | Radiotherapy Methods, System, And Software | Published | 18821844.0 | 3710112 | 29-Nov-2018 |
| 522C01US | U.S.A. | Magnetic Resonance Imaging At Low Field Strength | Allowed | 17/848277 | 2022-0334198 | 23-Jun-2022 |
| 522C03US | U.S.A. | Magnetic Resonance Imaging At Low Field Strength | Pending | 18/540,666 | | 14-Dec-2023 |
| 522D01CN | China | Magnetic Resonance Imaging At Low Field Strength | Published | 201780051306.1 | 115407252 | 22-Jun-2017 |
| 522D01JP | Japan | Magnetic Resonance Imaging At Low Field Strength | Published | 2022-078353 | 2022-116041 | 22-Jun-2017 |
| 522N02CA | Canada | Magnetic Resonance Imaging At Low Field Strength | Allowed | 3028716 | 3028716 | 22-Jun-2017 |
| 522N01EP | European Patent Office | Magnetic Resonance Imaging At Low Field Strength | Published | 17734947.9 | 3475718 | 22-Jun-2017 |
| 522N01HK | Hong Kong | Magnetic Resonance Imaging At Low Field Strength | Published | 19129081.6 | 40005721 | 22-Jun-2017 |
| 523D01CN | China | Planning And Control For Magnetic Resonance Guided Radiation Therapy | Published | 202011072387.3 | 112043979 | 11-Feb-2016 |
| 523D01EP | European Patent Office | Planning And Control For Magnetic Resonance Guided Radiation Therapy | Pending | 23201326828.2 | | 11-Feb-2016 |

| Dkt. Num. | Country | Title | Status | AppNumber | PubNumber | FileDate |
|---|---|---|---|---|---|---|
| 523D02CN | China | Planning And Control For Magnetic Resonance Guided Radiation Therapy | Published | 202210997198.X | 115337557 | 11-Feb-2016 |
| 523N01CA | Canada | Planning And Control For Magnetic Resonance Guided Radiation Therapy | Allowed | 2976331 | 2976331 | 11-Feb-2016 |
| 523N01HK | Hong Kong | Planning And Control For Magnetic Resonance Guided Radiation Therapy | Published | 18105955.2 | 1246229 | 11-Feb-2016 |
| 524D01CN | China | Ion Chamber For Radiation Measurement | Published | 202210997242.7 | 115373014 | 22-Jul-2016 |
| 524N01EP | European Patent Office | Ion Chamber For Radiation Measurement | Published | 16751068.4 | 3326007 | 22-Jul-2016 |
| 524N01HK | Hong Kong | Ion Chamber For Radiation Measurement | Published | 18113807.6 | 1254762 | 22-Jul-2016 |
| 527C01US | U.S.A. | Magnetic Resonance Volumetric Imaging | Published | 17/706458 | 2022-0218223 | 28-Mar-2022 |
| 527N01CA | Canada | Magnetic Resonance Volumetric Imaging | Published | 3028154 | 3028154 | 21-Jun-2017 |
| 528C02US | U.S.A. | Particle Therapy With Magnetic Resonance Imaging | Published | 17/832417 | 2022-0305289 | 3-Jun-2022 |
| 528D01JP | Japan | Particle Therapy With Magnetic Resonance Imaging | Published | 2022-016716 | 2022-070914 | 28-Feb-2017 |
| 528N01CA | Canada | Particle Therapy With Magnetic Resonance Imaging | Published | 3016026 | 3016026 | 28-Feb-2017 |
| 528N01CN | China | Particle Therapy With Magnetic Resonance Imaging | Published | 201780014851.3 | 109310879 | 28-Feb-2017 |
| 532C01US | U.S.A. | Radiation Therapy Systems And Methods | Allowed | 17/227155 | 2021-0220676 | 9-Apr-2021 |
| 532D02EP | European Patent Office | Radiation Therapy Systems And Methods | Pending | 23209870.7 | | 13-Dec-2017 |
| 532D02JP | Japan | Radiation Therapy Systems And Methods | Pending | 2023-134037 | | 13-Dec-2017 |
| 532N01CN | China | Radiation Therapy Systems And Methods | Published | 201780086321.X | 110382049 | 13-Dec-2017 |
| 538C01US | U.S.A. | Resistive Electromagnet Systems And Methods | Published | 17/559957 | 2022-0113360 | 22-Dec-2021 |
| 538D01JP | Japan | Resistive Electromagnet Systems And Methods | Pending | 2023-190726 | | 5-Nov-2018 |
| 538N01CN | China | Resistive Electromagnet Systems And Methods | Published | 201880069675.5 | 112424625 | 5-Nov-2018 |
| 538N01EP | European Patent Office | Resistive Electromagnet Systems And Methods | Published | 18804890.4 | 3794363 | 5-Nov-2018 |
| 541001US | U.S.A. | RF Coil Assemblies | Published | 17/880326 | 2023-0041633 | 3-Aug-2022 |
| 541001WO | Patent Cooperation Treaty | RF Coil Assemblies | Published | PCT/IB2022/057231 | 2023-012706 | 3-Aug-2022 |
| 542001US | U.S.A. | Systems, Methods And Computer Software For Optimized Radiation Therapy | Published | 17/969,540 | 2023-0125812 | 19-Oct-2022 |
| 542001WO | Patent Cooperation Treaty | Systems, Methods And Computer Software For Optimized Radiation Therapy | Published | PCT/IB2022/060069 | 2023-067529 | 19-Oct-2022 |
| 543001US | U.S.A. | MRI Guided Radiotherapy | Published | 17/969,544 | 2023-0125842 | 19-Oct-2022 |
| 543001WO | Patent Cooperation Treaty | MRI Guided Radiotherapy | Published | PCT/IB2022/060068 | 2023-067528 | 19-Oct-2022 |
| 545P01US | U.S.A. | Relative Electron Density Mapping From Magnetic Resonance Imaging | Pending | 18/491,426 | | 20-Oct-2022 |
| 545001WO | Patent Cooperation Treaty | Relative Electron Density Mapping From Magnetic Resonance Imaging | Pending | PCT/US2023/35628 | | 20-Oct-2022 |
| 546P01US | U.S.A. | Systems, Methods And Software For Magnetic Resonance Image Guided Radiotherapy | Pending | 18/491,527 | | 20-Oct-2022 |
| 546001WO | Patent Cooperation Treaty | Systems, Methods And Software For Magnetic Resonance Image Guided Radiotherapy | Pending | PCT/US2023/35632 | | 20-Oct-2022 |

Page 11

-14-

**Schedule 2.2**

**EXCLUDED ASSETS**

None

**<u>Schedule 4.5</u>**

**EXISTING INSURANCE POLICIES**

None

## **Schedule 4.6**

### **CONTRACTS**

See Schedule 1 to Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale filed 8/31/23 [Docket No. 229].

## **Schedule 4.7(b)**

### **INTELLECTUAL PROPERTY INFRINGEMENTS**

None

## **Schedule 4.8**

### **TAX ENCUMBRANCES**

None

**Contract List**

Schedule 6.13 –
Contract and Cure Schedule

| | Counterparty | Description | Address | Cure Claim |
|---|---|---|---|---|
| 3 | Accrualify, Inc. | Spend Management Platform Agreement, dated July 2, 2018, by and between Accrualify, Inc. and ViewRay Inc. | 311 9th Ave San Mateo, CA 94401 | $ 8,380.52 |
| 86 | CDW LLC | Sales and Service Projects Terms & Conditions found at https://www.cdw.com/content/cdw/en/terms-conditions/sales-and-service-projects.html, dated June 23, 2023, by and between CDW LLC and ViewRay Inc. | 200 N. Milwaukee Avenue Vernon Hills, IL 60061 | $30,679.25 |
| 96 | Cleveland Industrial Portfolio, LLC | Office Lease for 2 Thermo Fischer Way, Oakwood OH 44146, dated April 17, 2008, by and between Cleveland Industrial Portfolio, LLC and ViewRay Inc. | 3 Summit Park Suite 200 Cleveland, Ohio 44131 | $ 9,411.78 |
| 117 | De Ceunynck Radiotherapy | Distributor System Quote, dated November 22, 2021, by and between De Ceunynck Radiotherapy and ViewRay Technologies Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 118 | De Ceunynck Radiotherapy | Distributor System Quote, dated March 31, 2021, by and between De Ceunynck Radiotherapy and ViewRay Technologies Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 119 | De Ceunynck Radiotherapy | Distributor System Quote, dated September 17, 2020, by and between De Ceunynck Radiotherapy and ViewRay Technologies Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 120 | De Ceunynck Radiotherapy | Distributor System Quote, dated July 2, 2022, by and between De Ceunynck Radiotherapy and ViewRay Technologies Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 121 | De Ceunynck Radiotherapy | Distributor System Quote, dated June 30, 2022, by and between De Ceunynck Radiotherapy and ViewRay Technologies Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 122 | De Ceunynck Radiotherapy | International Distributor Agreement, dated July 15, 2021, by and between De Ceunynck Radiotherapy NV and ViewRay Technologies, Inc. | Kontichsesteenweg 36 Aartselaar, 2630 Belgium | $   - |
| 136 | DocuSign, Inc. | Master Services Agreement found at https://www.docusign.com/company/terms-and-conditions/msa, dated November 14, 2022, by and between DocuSign, Inc. and ViewRay Inc. | 221 Main Street, Suite 1000 San Francisco, CA 94105 | $ 1,169.14 |

-20-

**Schedule 6.13 –**
**Contract and Cure Schedule**

| # | Counterparty | Description | Address | Amount |
|---|---|---|---|---|
| 169 | Genesis Cancer Care UK Limited | System Purchase and Site Collaboration Framework Agreement (4 Systems), dated June 24, 2021, by and between Genesis Cancer Care UK Limited and ViewRay Technologies, Inc.<br>1. Genesis Care Oxford-Under Service and Support<br>2. Genesis Care Fort Meyers, FL, USA-Under warranty through March 3, 2024<br>3. Genesis Care Madrid-Spain-Under warranty through May 19, 2024<br>4. Genesis Care Guildford, UK-System PO Issued/Backlog<br>5. Genesis Care Birmingham, Sutton Coldfield, UK-System PO Issued-Backlog<br>6. Genesis Care Cromwell-London, UK-Under Service and Support | Wilson House, Waterberry Drive Waterlooville, Hampshire PO7 7XX United Kingdom | $ - |
| 171 | GitHub, Inc. | Customer Agreement found at https://github.com/customer-terms, dated December 2022, by and between GitHub, Inc. and ViewRay Inc. | 88 Colin P Kelly Jr Street San Francisco, CA 94107 | $ 8,085.97 |
| 251 | Involta, LLC | Service Order, Terms, & Conditions, dated September 29, 2021, by and between Involta, LLC and ViewRay Inc. | PO Box 1986 Cedar Rapids, IA 52406 | $ 1,883.08 |
| 254 | Iron Mountain Information Management, LLC | Customer Agreement & Pricing Schedule, dated September 1, 2022, by and between Iron Mountain Information Management, LLC and ViewRay Inc. | 2 Sun Court Norcross, GA 30092 | $ 5,947.70 |
| 265 | Japan Superconductor Technology, Inc. | Manufacturing and Supply Agreement, dated September 18, 2013, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $ - |
| 266 | Japan Superconductor Technology, Inc. | Fulfilled Purchase Order P15906, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. (Manufacturing and Supply Agreement, dated September 18, 2013) | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $ 890,000.00 |
| 267 | Japan Superconductor Technology, Inc. | Partially fulfilled Purchase Order P18298, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $ - |

## Schedule 6.13 –
## Contract and Cure Schedule

| # | Counterparty | Description | Address | Amount |
|---|---|---|---|---|
| 268 | Japan Superconductor Technology, Inc. | Unfulfilled Purchase Order P18305, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. (Manufacturing and Supply Agreement, dated September 18, 2013)<br><br>Including paid deposits totaling $4,620,000.00 | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $ 840,000.00 |
| 269 | Japan Superconductor Technology, Inc. | Unfulfilled Purchase Order P16668, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $    - |
| 270 | Japan Superconductor Technology, Inc. | Unfulfilled Purchase Order RQ-00913, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $    - |
| 271 | Japan Superconductor Technology, Inc. | Unfulfilled Purchase Order RQ-01398, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $    - |
| 272 | Japan Superconductor Technology, Inc. | Unfulfilled Purchase Order RQ-02473, by and between Japan Superconductor Technology, Inc. and ViewRay Inc. | Japan Superconductor Technology, Inc c/o General Technical Laboratory, Kobe Steel, Ltd. Takatasukadai 1-5-5, Nishi-ku Kobe, Hyogo Japan 651-2271 | $    - |
| 413 | Mass Precision Inc. | Various Purchase Orders, by and between Mass Precision Inc. and ViewRay Inc.<br><br>Including paid deposits totaling $311,200.50 | 2110 Old Oakland Rd. San Jose, CA 95131 | $    - |

-22-

**Schedule 6.13 –**
**Contract and Cure Schedule**

| # | Counterparty | Description | Address | Amount |
|---|---|---|---|---|
| 414 | Mass Precision Inc. | Partially fulfilled Purchase Order P18307, by and between Mass Precision Inc. and ViewRay Inc. | 2110 Old Oakland Rd. San Jose, CA 95131 | $246,687.20 |
| 415 | Mass Precision Inc. | Partially fulfilled Purchase Order P-04105, by and between Mass Precision Inc. and ViewRay Inc. | 2110 Old Oakland Rd. San Jose, CA 95131 | $ 4,674.25 |
| 416 | Mass Precision Inc. | Partially fulfilled Purchase Order P-04229, by and between Mass Precision Inc. and ViewRay Inc. | 2110 Old Oakland Rd. San Jose, CA 95131 | $ 9,193.10 |
| 426 | Mass Precision Inc. | Partially fulfilled Purchase Order P19215, by and between Mass Precision Inc. and ViewRay Inc. Including paid deposits totaling $252,496.00 | 2110 Old Oakland Rd. San Jose, CA 95131 | $  - |
| 427 | Mass Precision Inc. | Partially fulfilled Purchase Order P19840, by and between Mass Precision Inc. and ViewRay Inc. | 2110 Old Oakland Rd. San Jose, CA 95131 | $37,500.00 |
| 429 | Mass Precision Inc. | Partially fulfilled Purchase Order P20592, by and between Mass Precision Inc. and ViewRay Inc. | 2110 Old Oakland Rd. San Jose, CA 95131 | $36,574.00 |
| 568 | MR Solutions Limited | Development, Manufacturing/Supply Agreement, dated June 17, 2022, by and between MR Solutions Limited and ViewRay Inc. | Ashbourne House, The Guildway, Old Portsmouth Road, Guildford, Surrey, GU3 1LR United Kingdom | $  - |
| 569 | MR Solutions Limited | Partially fulfilled Purchase Order P-03086, by and between MR Solutions Limited and ViewRay Inc. (Development, Manufacturing/Supply Agreement, dated June 17, 2022) | Ashbourne House, The Guildway, Old Portsmouth Road, Guildford, Surrey, GU3 1LR United Kingdom | $ 629,946.25 |
| 589 | Oracle America, Inc. | Subscription Services Agreement, dated October 29, 2021, by and between Oracle America, Inc. and ViewRay Inc. | 500 Oracle Parkway Redwood Shore CA 94065 | $ 993.55 |
| 606 | Paramount Electronics Ltd | Partially fulfilled Purchase Order P18690, by and between Paramount Electronics Ltd and ViewRay Inc. Including paid deposits totaling $149,104.26 | 4 Little Balmer Buckingham MK18 1TF United Kingdom | $  - |
| 620 | PDSVISION US, Inc. d/b/a Boundary Systems | Proposal Terms & Conditions, dated October 3, 2022, by and between Boundary Systems and ViewRay Inc. | 7055 Engle Rd #601, Cleveland, OH 44130 | $ 1,454.00 |

**Schedule 6.13 –**
**Contract and Cure Schedule**

| | | | | |
|---|---|---|---|---|
| 665 | Perforce Software, Inc. | End-User License Agreement found at https://www.perforce.com/license-agreements, dated June 8, 2021, by and between Perforce Software, Inc. and ViewRay Inc. | 400 1st Ave North Suite 400 Minneapolis MN 55401 | $ - |
| 677 | PTC Inc. | Master Services Agreement, dated April 1, 2021, found at https://www.arenasolutions.com/terms/ and amended with One-Time Extended Payment Terms in quotation dated January 31, 2022. | 121 Seaport Boulevard, 13th floor Boston, MA 02210 | $78,207.08 |
| 693 | Quality Electrodynamics LLC | Development and Supply Agreement, dated June 1, 2010, by and between Quality Electrodynamics LLC and ViewRay Inc. | 700 Beta Drive Suite 100 Mayfield Village, Ohio 44143 | $ - |
| 808 | Radius S.r.L | Distributor System Quote , dated April 1, 2022, by and between Radius S.r.L. and ViewRay Technologies Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 809 | Radius S.r.L | Distributor System Quote , dated December 20, 2018, by and between Radius S.r.L. and ViewRay Technologies Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 810 | Radius S.r.L | Distributor System Quote dated December 20, 2018, by and between Radius S.r.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 811 | Radius S.r.L | Distributor System Quote dated September 6, 2019, by and between Radius S.r.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 812 | Radius S.r.L | Distributor System Quote, dated January 19, 2023, by and between Radius S.r.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 813 | Radius S.r.L | Distributor System Quote, dated January 19, 2023, by and between Radius S.r.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 814 | Radius S.r.L | Distributor System Quote dated July 1, 2021, by and between Radius S.r.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |
| 815 | Radius S.r.L | International Distributor Agreement dated November 4, 2021, by and between Radius S.R.L. and ViewRay Technologies, Inc. | Via Luigi Merarini, 32 40054 Budrio (BO) Italy | $ - |

-24-

**Schedule 6.13 –**
**Contract and Cure Schedule**

| 843 | Salesforce Inc. | Main Services Agreement found at https://www.salesforce.com/content/dam/web/en_us/www/documents/legal/Salesforce_MSA.pdf, dated June 2, 2023, by and between Salesforce Inc. and ViewRay Inc. | 415 Mission Street, 3rd Floor San Francisco, CA 94105 | $   - |
|---|---|---|---|---|
| 850 | ServiceMax | Hosted Services Agreement found at http://www.servicemax.com/pdfs/msa.pdf, dated July 2022, by and between ServiceMax and ViewRay Inc. | 4450 Rosewood Drive, Ste 200 Pleasanton, CA 94588 | $ 982.66 |
| 851 | SHI International Corp | Online Customer Resale Terms and Conditions found at https://www.shi.com/terms/online-resale-terms, by and between SHI International Corp and ViewRay Inc. | 290 Davidson Avenue Somerset, NJ 08873 | $ 3,394.96 |
| 950 | Tetraon Medikal | ViewRay System Quote, dated December 1, 2019, by and between Tetraon Medikal Dan. San. Ve Tic. Ltd. Sti. And ViewRay Technologies, Inc. | Mustafa Kemal, 2118. Cd. Maidan İş ve Yaşam Merkezi C-171, 06510 Çankaya/Ankara, Türkiye | $   - |
| 951 | Tetraon Medikal | International Distributor Agreement, dated December 1, 2019, by and between Tetraon Medikal Dan.San.Ve.Tic. Ltd. Sti. and ViewRay Technologies, Inc. | Mustafa Kemal, 2118. Cd. Maidan İş ve Yaşam Merkezi C-171, 06510 Çankaya/Ankara, Türkiye | $   - |
| 1051 | Viking Resources, Inc. | Consulting Services Agreement, dated November 8, 2021, by and between Viking Resources, Inc. and ViewRay Inc. | 171 Colonial Drive, Woodstock, Georgia 30189 | $ 168.16 |

-25-

# EXHIBIT A

## FORM OF BILL OF SALE

This BILL OF SALE (this "***Bill of Sale***"), is executed and delivered as of [_____], 2024, by and among George L. Miller, as the chapter 7 trustee for the estates of ViewRay, Inc., a Delaware corporation, and ViewRay Technologies, Inc., a Delaware corporation ("***Seller***") for the benefit of MNP Holdings LLC, a Wyoming limited liability company, or its designated affiliate ("***Buyer***").

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as January 12, 2024, by and among Seller and Buyer (as modified, amended, or supplemented, the "***Asset Purchase Agreement***"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.      <u>Defined Terms</u>. All initially capitalized terms used but not defined herein have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.      <u>Transfer of Purchased Assets</u>. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and deliver to Buyer, and Buyer's successors and assigns, all of the right, title, and interest of Seller in and to the Purchased Assets owned by the Estates free and clear of all Encumbrances (other than Permitted Encumbrances).

3.      <u>Further Assurances</u>. If Buyer shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances, or any other actions or things are necessary or desirable to vest, perfect, or confirm ownership (of record or otherwise) in Buyer, Buyer's right, title, or interest in, to, or under any or all of the Purchased Assets transferred and conveyed by Seller hereunder, Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect, or confirm any and all right, title, and interest in, to, and under such rights, properties, or assets in Buyer, in each case at Buyer's cost and expense.

4.      <u>Binding on Successors; No Third-Party Beneficiaries</u>. This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and the successors in interest and

A-1

permitted assigns of such parties. This Bill of Sale is not intended to confer any rights or remedies upon any Person other than the parties hereto.

5.      Counterparts. This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. A manual signature on this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Bill of Sale or such other document for all purposes.

6.      Terms of the Asset Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement. To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

7.      Governing Law. THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

8.      Other Provisions. Sections 6.11 (Further Assurances), 9.3 (Interpretation), 9.5 (Severability), 9.6 (Entire Agreement), 9.7 (Assignment, Successors and No Third Party Rights) and 9.8 (Amendment and Modification; Waiver) of the Asset Purchase Agreement apply *mutatis mutandis* to this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

A-2

IN WITNESS WHEREOF, Sellers have executed this Bill of Sale as of the day and year first above written.

**SELLER**:

GEORGE L. MILLER, AS CHAPTER 7
TRUSTEE OF THE ESTATES OF VIEWRAY,
INC. AND VIEWRAY TECHNOLOGIES, INC.

By: _____
Name: George L. Miller
Title: Chapter 7 Trustee

A-3
[Signature page to Bill of Sale]

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed and delivered as of [_____  __], 2024, by and among George L. Miller, as chapter 7 trustee for the estates of ViewRay, Inc., a Delaware corporation, and ViewRay Technologies, Inc., a Delaware corporation ("**Seller**"), to MNP Holdings LLC, a Wyoming limited liability company, or its designated affiliate ("**Buyer**"), pursuant to the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as January 12, 2024, by and among Buyer and Seller (as modified, amended, or supplemented, the "**Asset Purchase Agreement**"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Defined Terms. All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

2.      Assignment of Assigned Contracts. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, and Buyer hereby purchases, acquires and accepts from Seller, all right, title and interest of Seller in and to the Assigned Contracts set forth on attached Schedule A.

3.      Assumption of Assumed Liabilities. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Buyer hereby assumes and agrees to discharge or perform when due (in accordance with the respective terms and subject to the respective conditions of the Assigned Contracts in the case of the Assigned Contracts), the Assigned Contracts and all other Liabilities of Seller that constitute Assumed Liabilities. Other than the obligations under the Assigned Contracts, and the other liabilities of Sellers that constitute Assumed Liabilities, Buyer has not assumed any Liability of any nature or kind whatsoever of Seller.

4.      Binding on Successors; No Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties. This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

B-1

5.    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

6.    <u>Terms of the Asset Purchase Agreement</u>. Nothing in this Agreement, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement. To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

7.    <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

8.    <u>Other Provisions</u>. Sections 6.11 (Further Assurances), 9.3 (Interpretation), 9.5 (Severability), 9.6 (Entire Agreement), 9.7 (Assignment, Successors and No Third Party Rights) and 9.8 (Amendment and Modification; Waiver) of the Asset Purchase Agreement apply *mutatis mutandis* to this Agreement.

[SIGNATURE PAGE FOLLOWS]

B-2

IN WITNESS WHEREOF, the undersigned hereby execute this Assignment and Assumption Agreement the day and year first above written.

**BUYER**:

MNP HOLDINGS LLC

By: _____
Name: Brad Nelson
Title: Manager and President

**SELLER**:

GEORGE L. MILLER, AS CHAPTER 7
TRUSTEE OF THE ESTATES OF VIEWRAY,
INC. AND VIEWRAY TECHNOLOGIES, INC.

By: _____
Name: George L. Miller
Title: Chapter 7 Trustee

B-3
[Signature page to Assignment and Assumption Agreement]

<u>Schedule A</u>
Assigned Contracts

**EXHIBIT C**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This Intellectual Property Assignment Agreement (this "***Agreement***"), dated as of [●], 2024 (the "***Effective Date***"), is entered into by and between George L. Miller, as chapter 7 trustee for the estates of ViewRay, Inc., a Delaware corporation, and ViewRay Technologies, Inc., a Delaware corporation ("***Assignor***"), and MNP Holdings LLC, a Wyoming limited liability company, or its designated affiliate ("***Assignee***"). Capitalized terms used but not defined herein, as well as the lower-case term "affiliates", shall have the meaning ascribed to such term in the Purchase Agreement (as defined below).

**WHEREAS**, pursuant to the Asset Purchase Agreement dated as of January 12, 2024 (as amended, the "***Purchase Agreement***") by and between Assignor and Assignee, Assignor agreed to transfer, convey and deliver to Assignee, and Assignee agreed to accept from Assignor, all of Assignor's right, title and interest in, to and under the [Patents set forth in <u>Schedule A</u> (the "***Assigned Patents***"), the Trademarks set forth in <u>Schedule B</u> (the "***Assigned Trademarks***"), the Copyrights set forth in <u>Schedule C</u> (the "***Assigned Copyrights***"), the Trade Secrets set forth in <u>Schedule D</u> (the "***Assigned Trade Secrets***"), and the Governmental Authorizations set forth in <u>Schedule E</u> (the "***Governmental Authorizations***")] (collectively, the "***Assigned Intellectual Property***").

**NOW**, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Assignment</u>. Assignor hereby irrevocably, absolutely and unconditionally assigns, transfers, conveys and delivers to Assignee, and Assignee hereby accepts, all of Assignor's rights, title and interests of every kind, nature and description in, to and under the Assigned Intellectual Property. The assignment of the rights, title and interests in Assigned Intellectual Property pursuant to this Section 1 shall include (a) the assignment of all of such Assignor's rights, title and interests in the Assigned Intellectual Property, (b) the rights, as applicable, whether accruing before, on, or after the Effective Date: (i) to sue and recover damages and obtain other equitable relief for past, present and future infringement, misappropriation or other violation or conflict associated with such Assigned Intellectual Property, (ii) to collect past, present and future royalties, damages, proceeds and other payments under such Assigned Intellectual Property, (iii) to claim priority based on such Assigned Intellectual Property under the laws of any jurisdiction and/or under international conventions or treaties, (iv) to prosecute, register, maintain and defend such Assigned Intellectual Property before any public or private agency, office or registrar and (v) to fully and entirely stand in the place of such Assignor and its affiliates, as applicable, in all matters related to such Assigned Intellectual Property as if this Agreement had not been made, and (c) any and all rights corresponding to any of the foregoing throughout the world.

2.    <u>Recordation</u>. Assignor hereby authorizes Assignee to record this assignment with any relevant governmental authority so as to perfect its ownership of the Assigned Patents. Assignor hereby authorizes and requests, as applicable, the Commissioner for Patents of the United States Patent and Trademark Office and other empowered officials of the United States Patent and Trademark Office, officials of corresponding entities or agencies in any applicable jurisdictions, and any other relevant authority, to transfer all registrations and registration applications for the Assigned Patents to Assignee as assignee of all of Assignor's right, title and interest therein, thereto and thereunder, and to issue to Assignee all registrations which may issue with respect to any applications included in such Assigned Patents.

3.    <u>No Third Party Beneficiaries</u>. This Agreement is for the sole and exclusive benefit of the parties hereto and their respective affiliates, Representatives, successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the parties hereto and their respective affiliates, Representatives, successors and permitted assigns any right, remedy or claim under or by reason of this Agreement or any terms hereof.

4.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.    <u>Subject to Purchase Agreement</u>. The scope, nature and extent of the Assigned Intellectual Property are expressly set forth in the Purchase Agreement. Nothing contained in this Agreement shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. This Agreement does not create or establish rights or Liabilities not otherwise created or existing under or pursuant to the Purchase Agreement. In the event of any conflict between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern and control. For the avoidance of doubt, any controversy or claim arising under this Agreement shall be governed solely by, and subject to the terms of, the Purchase Agreement.

6.    <u>Governing Law, etc.</u> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

7.    <u>Dispute Resolution</u>. This Agreement shall be subject to the provisions set forth in Section 9.9(b) of the Purchase Agreement, mutatis mutandis, as if set forth herein.

C-2

8.      <u>Amendment, Waiver and Termination</u>. This Agreement, the Transaction Agreement and the other Transaction Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersedes all other understandings and negotiations with respect thereto. This Agreement may not be amended or terminated, and no provision hereof may be waived, except by a writing signed by each of the parties hereto.

9.      <u>Interpretation</u>. This Agreement shall be subject to the provisions set forth in Section 9.3 (Interpretation) of the Purchase Agreement, mutatis mutandis, as if set forth herein.

10.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Signature Page Follows*]

C-3

**IN WITNESS WHEREOF**, Assignor and Assignee executed and delivered this Intellectual Property Assignment Agreement as of the Effective Date.

**AGREED AND ACCEPTED:**

**ASSIGNOR:**

GEORGE L. MILLER, AS CHAPTER 7
TRUSTEE OF THE ESTATES OF VIEWRAY,
INC. AND VIEWRAY TECHNOLOGIES, INC.


By: _____
Name: George L. Miller
Title: Chapter 7 Trustee


**ASSIGNEE:**

MNP HOLDINGS LLC


By: _____
Name: Brad Nelson
Title: Manager and President

C-4
[Signature page to Intellectual Property Assignment Agreement]

**[SCHEDULE A]**

[ASSIGNED PATENTS]

| Docket Number | Jurisdiction | Application No. | Application Date | Pub./Pat. No. | Record Owner | Legal Owner |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

## [SCHEDULE B]

[ASSIGNED TRADEMARKS]

C-6

## [SCHEDULE C]

[ASSIGNED COPYRIGHTS]

C-7

**[SCHEDULE D]**

[ASSIGNED TRADE SECRETS]

C-8

**[SCHEDULE E]**

[Governmental Authorizations]

C-9