**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 7 |
| ViewRay, Inc., *et al.*, | Case No. 23-10935 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 582 & 585** |

**REPLY OF THE DIP SECURED PARTIES AND THE PREPETITION SECURED PARTIES IN SUPPORT OF THE TRUSTEE'S DISTRIBUTION MOTION**

The DIP Agent and the Prepetition Agent, for themselves and on behalf of the DIP Secured Parties and the Prepetition Secured Parties (collectively, the "Lenders"), respectfully state as follows in reply to the *Objection of Scan Global Logistics to Trustee's Distribution Motion* (D.I. 585) and in support of the *Motion of George L. Miller, the Chapter 7 Trustee, for Authorization to Distribute the Proceeds from the Sale of the Debtors' Assets Pursuant to the Sharing Agreement with the Lenders* (D.I. 582) (the "Distribution Motion"):[2]

**PRELIMINARY STATEMENT**

1. Scan Global's objection should be overruled. To prevail, Scan Global bears the burden of proving the priority, validity, and extent of its asserted liens in the Debtors' inventory—including, crucially, that its liens are senior to the Lenders' otherwise first-priority security interests. Scan Global argues, without any evidentiary support or legal analysis, that it has valid, senior liens on the Debtors' inventory. Yet Scan Global has failed to plead the existence

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are ViewRay, Inc. (7485) and ViewRay Technologies, Inc. (8429). The mailing address for each of the Debtors is 2 Thermo Fisher Way, Oakwood, OH 44146.

[2] Capitalized terms not defined herein are used as defined in the Distribution Motion or the Final DIP Order (defined below).

of facts—let alone support or establish those facts with competent evidence—that would meet its burden.

2. For these reasons, and the reasons discussed below, the Court should overrule Scan Global's objection and grant the relief requested in the Distribution Motion.

## BACKGROUND

### A. The Lenders have unavoidable first-priority security interests in all the Debtors' assets, including inventory and proceeds of inventory.

3. On November 14, 2022, the Debtors entered into a certain *Credit, Security and Guaranty Agreement* (as amended, restated, modified or supplemented from time to time, the "Prepetition Credit Agreement") with the Lenders. The Prepetition Credit Agreement provided for a credit facility comprising of: (i) a $75,000,000 tranche I term loan; (ii) a $25,000,000 tranche II term loan; and (iii) a $15,000,000 revolving loan. On the same day, the Prepetition Secured Parties duly perfected first-priority security interests and liens on the Debtors' right, title, and interest in, to and under the Prepetition Collateral, by among other things, filing a UCC-1 financing statement covering all the Debtors' assets. Pursuant to a springing intellectual property security agreement, executed on March 23, 2023, the Prepetition Secured Parties subsequently filed a UCC-3 financing statement amendment on March 28, 2023, amending the UCC-1 financing statement to include the then-sprung security interest in the Debtors' intellectual property. The Prepetition Collateral consists of all the Debtors' assets, including all inventory and goods and their proceeds. True and correct copies of the UCC financing statement and amendment are attached hereto collectively as **Exhibit A**.

4. On July 16, 2023 (the "Petition Date"), the Debtors commenced these jointly administered bankruptcy cases by each filing a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

5. On August 29, 2023, the Court entered the *Final Order (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Secured Parties; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (D.I. 226) ("Final DIP Order"). The Final DIP Order authorized the Debtors to use Cash Collateral subject to the Budget and the other terms of the Final DIP Order and Operative Documents, and approved the Debtors' entry into the DIP Facility in accordance with the Operative Documents.

6. The Final DIP Order contains customary stipulations by the Debtors regarding the validity, extent, and priority of the Prepetition Secured Parties' security interests in the Debtors' assets, including that:

> The Prepetition Secured Obligations constitute legal, valid, binding and unconditional obligations of the Debtors to the Prepetition Secured Parties, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).
>
> * * *
>
> Pursuant to and in connection with the Prepetition Loan Documents, the Debtors granted to the Prepetition Secured Parties continuing, legal, valid, binding, properly perfected, enforceable, non-avoidable first priority liens on and security interests in (the "Prepetition Liens") all of the Prepetition Collateral[.]
>
> * * *
>
> The Prepetition Secured Parties duly perfected the Prepetition Liens in the Prepetition Collateral[.]

Final DIP Order ¶ D. The Debtors' stipulations were subject to potential challenge by other parties in interest, but the challenge period expired and was extinguished, including by virtue of the Sharing Agreement, discussed below.

7. The Final DIP Order granted the Prepetition Secured Parties Adequate Protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including through use of Cash Collateral, Prepetition Collateral, and the priming of their interests in Prepetition Collateral by the DIP Facility (such diminution in value, the "Adequate Protection Amount"). *See* Final DIP Order ¶ 4.

8. The Adequate Protection includes, as security for the payment of the Adequate Protection Amount, valid, binding, continuing, enforceable, fully perfected, *first priority* senior replacement liens on and security interests in any and all pre- and postpetition property of the Debtors and their estates, whether existing before, on or after the Petition Date, together with any proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (collectively with the Prepetition Collateral, including Cash Collateral, "Collateral"), including any proceeds thereof. *See id.*

9. On October 26, 2023 (the "Conversion Date"), the Debtors' chapter 11 cases were converted to cases under chapter 7 (D.I. 398).

10. On or about the Conversion Date, the Office of the United States Trustee appointed George L. Miller as the chapter 7 trustee for the Debtors' estates (the "Trustee").

11. As the Trustee has acknowledged in prior papers filed in these cases, the liens and claims of the Lenders exceed the value of the Collateral. As a result, the Trustee determined that he would not have the resources to administer the estates without an agreed carve out from the Lenders' Collateral. To that end, the Trustee negotiated the Sharing Agreement with the Lenders, which the Court approved on December 21, 2023, pursuant to the *Order Granting*

*Chapter 7 Trustee's Motion for (I) Approval of Sharing Agreement and Carve Out with Lenders, and (II) Related Relief* (D.I. 493) (the "Approval Order"). The Sharing Agreement provides for, among other things, (i) the determination and allowance of the Lenders' pre-petition claims and liens; (ii) the Trustee's use of Cash Collateral for purposes of administering, recovering, preserving, marketing, and selling the Estates' assets and the Lenders' Collateral; (iii) the specified carve-out from the Lenders' liens; and (iv) related matters.

12. Additionally, the Sharing Agreement reiterates that "the Prepetition Secured Obligations are secured by valid, enforceable, perfected, and non-avoidable first-priority liens and security interests granted by the Debtors to the Lenders upon and in the Collateral." Sharing Agreement ¶ 3. Moreover, the Approval Order confirms that "[t]he Debtors are indebted to the Lenders in the aggregate amount of the Lenders' Claim Amount [and that] [t]he Obligations constitute legal, valid, binding obligations of the Estates, enforceable in accordance with their terms, and such claims shall be allowed in the Bankruptcy Cases." Approval Order ¶ 4. The Approval Order further provides that "[s]uch claims are secured by valid, enforceable, perfected, and non-avoidable *first-priority* security interests and liens on the Collateral." *Id.* (emphasis added).

13. Under the Sharing Agreement and Approval Order, the "Claim Amount" of the Lenders is defined as an allowed claim of not less than $64.3 million secured by the Collateral:

> The claims of the Lenders shall be allowed, as of the Conversion Date, in an amount not less than $64.3 million (the "Claim Amount"). The allowed Claim Amount shall be deemed secured by the Collateral to the extent of the value of the Debtors' interest in such Collateral, and the Lenders shall not be required to file a proof of claim in the Bankruptcy Cases for any secured or unsecured claim arising under the Pre-Petition Credit Agreement and Operative Documents.

Sharing Agreement ¶ 5. Additionally, under the Sharing Agreement, the Adequate Protection

Amount is not less than $19.8 million. *Id.* ¶ S. The Sharing Agreement acknowledges that, as the Final DIP Order provides, the Adequate Protection Amount is secured by "valid, binding, continuing, enforceable, fully perfected, *first priority* senior replacement liens on and security interests" in all the Debtors' pre- and postpetition assets. *Id.* ¶ Q (emphasis added).

14. Like the Final DIP Order, "[t]he terms and provisions of th[e] [Approval] Order and the Sharing Agreement" are "binding upon . . . all creditors and equity interest holders of the Debtors, all other parties in interest[.]" Approval Order ¶ 5.

**B. Scan Global reserved the right to assert priority liens or claims, and the Trustee, the estates, and parties in interest, including the Lenders, reserved the right to challenge Scan Global's asserted liens or claims.**

15. Scan Global asserts that the Final DIP Order "contained language that preserved Scan Global's liens." Scan Global Objection ¶ 6. To be clear, the Final DIP Order preserves Scan Global's *right to assert* any lien it may have in goods in its possession, but did not approve the validity, amount, or priority of any such liens. Final DIP Order ¶ 5.39. Indeed, the Final DIP Order also expressly preserved and reserved "the rights of the Debtors and all other parties in interest to oppose, and object to, or seek to avoid Scan Global's assertion of any such liens, claims, rights or remedies." *Id.*

16. The Approval Order likewise preserves any rights held by Scan Global in relation to any goods in its possession, provided that the rights of the Trustee and all other parties in interest to oppose and object to any such asserted liens, claims, rights, or remedies are preserved and reserved. Approval Order ¶ 7.

**C. The Sale Order preserved the parties' rights in respect of Scan Global's asserted liens.**

17. On or about February 7, 2024, the Trustee closed a sale of substantially all the Debtors' assets in accordance with the *Order (I) Approving the Sale of Substantially All Assets*

*of the Debtors and Their Estates Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (D.I. 534) (the "Sale Order").

18. Like the Approval Order, the Sale Order reserved the parties' rights in respect of Scan Global's asserted liens, providing that "Scan Global shall have a lien on the proceeds of the Sale related to such assets in the same order of priority, with the same validity, force, and effect that such lien, if any, had prior to the Sale, and the rights of the Trustee and all other parties in interest to oppose, and object to, or seek to avoid Scan Global's assertion of any such liens, claims, rights or remedies, if any, and to seek any related relief, are preserved and reserved." Sale Order ¶ 11(a).

19. Scan Global now opposes the Trustee's motion to distribute the proceeds of the sale to the Lenders, asserting—without any factual or legal support—that Scan Global has valid and enforceable liens, which have priority over the Lenders' liens. For the reasons set forth below, Scan Global's objection should be overruled and the Distribution Motion should be approved.

**REPLY**

20. Scan Global asserts that it has warehouse and carrier's liens on the proceeds of the Debtors' inventory that has a higher priority than the Lenders' liens. But Scan Global bears the burden of establishing the priority, amount, and validity of its liens, and it has provided no factual or legal basis to support its assertions. Scan Global's objection therefore fails.

**I. Scan Global bears the burden of establishing the priority, validity,' and extent of its claimed liens.**

21. The Trustee's sale of the Debtors' assets was approved under section 363(b) of the Bankruptcy Code, and the Trustee now seeks to distribute the proceeds of that sale in

accordance with the Sharing Agreement and pursuant to sections 363(b) and 726(a) of the Bankruptcy Code. Section 363(p)(2) of the Bankruptcy Code provides that, "[i]n any hearing under this section . . . the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2).

22. Scan Global asserts that it has a valid possessory lien in the Debtors' inventory with priority over the otherwise first-priority security interests of the Lenders. Under section 363(p)(2) of the Bankruptcy Code, Scan Global bears the burden of establishing the priority, validity, and extent of its lien by the preponderance of the evidence. *See, e.g.*, *In re Elk Grove Village Petroleum, LLC*, 562 B.R. 708, 717 (Bankr. N.D. Ill. 2016) (party asserting an interest in property must prove the validity, extent and priority under section 363(p)(2) by a preponderance of the evidence), *aff'd sub nom. Ill. Dept. of Revenue v. Hanmi Bank*, 895 F.3d 465 (7th Cir. 2018).

## II. Scan Global has not and cannot meet its burden to establish that its liens have priority over the Lenders' first-priority security interests.

23. Before even reaching the issue of whether Scan Global's liens are valid, or addressing their extent, Scan Global's objection fails because even if Scan Global had valid liens, it has not and cannot meet its burden of establishing the alleged priority of its liens over the Lenders' first-priority security interests.

24. As an initial matter, Scan Global does not identify what state's law—or even what country's law—it believes applies to establish the priority of its liens. Instead, Scan Global merely references in passing sections 9-333, 7-307, and 7-209 of the Uniform Commercial Code as providing the basis for its asserted lien priority. Obj. ¶ 4. But it fails to identify what state's enactment of the UCC applies or whether the enactment is uniform or nonuniform for the cited UCC provisions, which can vary substantially from state to state. Nor does Scan Global address

what law applies to goods held overseas, or even if the laws of overseas jurisdictions in which it claims a possessory lien permit the creation of a possessory lien, and, if so, whether such a possessory lien has priority over prior-perfected security interests. Scan Global cannot be found to have carried its burden under section 363(p)(2) when it has failed even to identify—let alone explain—the application of any governing law providing for priority. Accordingly, its objection fails for this reason alone.

25. Yet even if the Court were to examine the cited UCC provisions—the only law Scan Global cites—Scan Global still cannot prevail because its alleged liens are expressly subordinate to the Lenders' security interests under those UCC provisions.

26. To start, Scan Global cites section 9-333 of the UCC, entitled "Priority of Certain Liens Arising by Operation of Law." U.C.C. § 9-333. Scan Global assumes—without explanation, citation to authority, or reference to specific evidence—that it has such a possessory lien. Scan Global then seemingly assumes, again without explanation, citation to authority, or reference to specific evidence, that its alleged possessory liens have priority over the Lenders' security interests. But Scan Global ignores the actual language of section 9-333, including the exception to the general rule that possessory liens have priority over Article 9 security interests. Specifically, section 9-333(b) provides that "[a] possessory lien on goods has priority over a security interest in the goods *unless the lien is created by a statute that expressly provides otherwise*." U.C.C. § 9-333(b) (emphasis added). Thus, if Scan Global's liens are created by a statute that subordinates the liens to a prior perfected security interest, then Scan Global cannot establish priority over the Lenders' liens. Unfortunately for Scan Global, its asserted liens are created by just such a statute.

27. Scan Global alleges that its liens arise from warehousing and carrier

services provided to the Debtors and cites sections 7-209 ("Lien of Warehouse") and 7-307 ("Lien of Carrier") of the UCC as the statutory bases purportedly establishing its liens. *See* Obj. ¶ 4. Under section 7-209(c) of the UCC, a warehouse's possessory lien is subordinated to a perfected security interest unless the holder of the security interest consents. *See id.* § 7-209(c). Thus, under section 9-333(b) of the UCC, the statute creating the warehouse's possessory lien (section 7-209) expressly provides that the warehouse's possessory lien does not have priority over a perfected security interest—unless, of course, the holder of the security interest consents. *See* U.C.C. § 7-209 Official Comment No. 3 ("Thus the special priority granted to statutory liens by Section 9-333 does not apply to liens under subsection (a) of this section [7-209], since subsection [7-209](c), second sentence, 'expressly provides otherwise' within the meaning of Section 9-333.").[3] The Lenders did not consent, and Scan Global does not even allege that the Lenders consented. Accordingly, Scan Global's claimed warehouse's lien is subordinated to the Lenders' security interests under the plain language of sections 7-209(c) and 9-333(b) of the UCC.

28. Scan Global's claimed carrier's lien fares no better. Unlike a warehouse's lien—which can be established as either a specific lien or a general lien—a carrier's lien is limited only to specific lien.[4] Under section 7-307 of the UCC, "[a] carrier has a lien on the goods covered

---

[3] *See also K Furniture Co. v. Sanders Transfer & Storage Co.*, 532 S.W.2d 910 (Tenn. 1975) (holding that secured lender had priority because the record did not establish that the secured lender had delivered or entrusted the goods to the bailor "with the actual or apparent authority" to store the goods); *In re Siena Publishers Assocs.*, 149 B.R. 359 (Bankr. S.D.N.Y. 1993) (subordinating a warehouse's lien to a prior perfected security interest because "the debtor could not validly pledge its inventory to a bona fide pledgee for value because the bank possessed a validly perfected security interest in all of the debtor's assets, including its inventory").

[4] Scan Global seemingly argues that it has a "general lien" on all goods in its possession—meaning a lien covering past and current charges, whether for services related to the goods currently in its possession or past services for goods no longer in its possession—as opposed to merely a specific lien, which is a lien on goods in its possession for services related only to those goods. *See* Obj. ¶ 3 ("Scan Global has a general lien upon all property in its possession.").

by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation." UCC § 7-307(a) (emphasis added). Section 7-307 thus establishes only a specific lien securing solely the charges and expenses arising from the shipping services relating to the specific goods in the carrier's possession. As the commentary to the rule makes clear, section 7-307 does not grant the carrier a general lien: "The section is intended to give carriers a specific statutory lien for charges and expenses similar to that given to warehouses . . . [b]ut because carriers do not commonly claim a lien for charges in relation to other goods or lend money on the security of goods in their hands, provisions for a general lien or a security interest similar to those in Section 7-209(a) and (b) are omitted." U.C.C. § 7-307 Official Comment No. 1.

29. The law is thus clear that Scan Global cannot claim a general lien on inventory it holds for past shipping charges, let alone one in higher priority to the Lenders' first-priority security interest in all inventory. Rather, Scan Global can claim only a specific lien for shipping charges related to specific goods. But Scan Global does not identify any specific goods or specific charges, or relate specific charges to specific goods, as necessary to establish a carrier's lien. Additionally, on information and belief, after closing of the Sale, the Purchaser of the Debtors' assets paid Scan Global to ship goods in its possession to the Purchaser, meaning that whatever charges were ultimately incurred in the shipping of the goods were paid by the Purchaser. Accordingly, Scan Global's asserted priority shipper's lien also fails.

30. Scan Global has not plead the existence of facts—let alone offered evidence to support and prove facts—sufficient to establish a right to priority over the Lenders' first-priority security interests in all the Debtors' assets, including inventory. Accordingly, Scan Global has not met its burden under section 363(p)(2) of the Bankruptcy Code and its objection should be

overruled.

**III. Scan Global has not established the validity or extent of its purported possessory liens.**

31. Because Scan Global cannot establish it is entitled to priority over the Lenders' security interests, the validity and extent of its purported possessory liens is irrelevant. In any event, as with its claimed priority, Scan Global also fails to establish the validity and extent of its purported possessory liens.

32. Again, Scan Global does not identify what law it believes applies to the validity or extent of its liens. As discussed above, the objection fails for this reason alone.

33. Even if considered, the passing references to the UCC are not enough to establish the validity and extent of its lien. Instead, Scan Global would need to plead—and then support and prove with evidence—specific facts to establish a valid lien and its extent. For example, under section 7-209(a) of the UCC, a warehouse's lien can either be a specific lien or a general lien. Though Scan Global asserts a general lien, citing to its terms and conditions of service, it does not point to any specific language establishing a general lien, nor does there appear to be any in the documents attached to Scan Global's objection. Similarly, to establish a specific lien, Scan Global would need to identify the specific goods and specific charges at issue and relate those charges to specific goods. It has failed to plead the existence of those facts supporting a specific lien, let alone offer evidence to prove those facts. Likewise, as discussed above, a carrier's lien may only be a specific lien, defeating as a matter of law Scan Global's claim of a general carrier's lien. And, as also discussed above, Scan Global has failed to establish a specific carrier's lien because it has failed to identify any specific charges related to specific goods that remained in its possession as of the Sale. For these reasons, Scan Global has failed to meet its burden to establish the validity of its asserted liens.

34. Scan Global's efforts to establish the extent of its asserted possessory liens is equally deficient. Even if Scan Global had a valid lien (it does not), the lien would only be worth the value of the goods in its possession at the time of the Sale and the proceeds thereof. *See* UCC § 7-209(a) ("A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof *in its possession*." (emphasis added)). Therefore, under section 363(p)(2) of the Bankruptcy Code, Scan Global bears the burden of establishing the value of those goods in its possession at the time of the Sale. Scan Global offers no evidence to meet this burden. Instead, Scan Global makes only naked assertions based on information and belief, not evidence upon which the Court could make a factual finding in Scan Global's favor. Even Scan Global's unsupported assertions are conclusory and contradictory.

35. For example, Scan Global asserts that "upon information and belief, the backup bidder was willing to pay $1 million just for the Debtors' intellectual property" and extrapolates from that assertion that the Debtors' inventory therefore must be worth the remaining $4 million of the cash purchase price. Scan Global Objection ¶ 11. Yet Scan Global ignores that there was only one bidder who wanted to purchaser the Debtors' inventory on a stand-alone basis, and its bid for the inventory was for just $500,000, and also included a license (but not a purchase) of the Debtors' intellectual property. Applying Scan Global's logic that the competing bids for the Debtors' assets are indicative of the value of the inventory, this bid for the inventory means the inventory is worth no more than $500,000, and potentially significantly less given that the bid also included an IP license as part of the assets being purchased (an asset over which Scan Global does not have, nor does it claim to have, any lien or interest).

36. Scan Global also points to a purchase price allocation made by the Purchaser under the Asset Purchase Agreement but ignores that the allocation was not created for

the purpose of establishing the value of any particular property for distribution purposes, but solely as a tax allocation for purposes. Rather, the Asset Purchase Agreement expressly disclaims and forbids any use of the purchase price allocation for establishing the value of distributions to the Debtors' creditors. Indeed, the relevant provision of the Asset Purchase Agreement states the purchase price allocation made thereunder "shall not, and shall not be interpreted to, have any effect on any distributions to creditors of either or both of the Debtors or Estates." *Asset Purchase Agreement* § 2.6 [D.I. 234-1]. Therefore, Scan Global cannot rely on a purchase price allocation to dispute the Trustee's proposed distribution to creditors, especially when the parties to that tax-driven allocation expressly disclaimed and forbid that it would have any effect on distributions to creditors.

37. Scan Global also alleges that "[a]fter the Conversion Date, Scan Global received multiple requests from customers of the Debtors requesting to purchase directly from Scan Global the goods in Scan Global's possession" and argues that this means the inventory it held had significant value. Obj. ¶ 13. Yet Scan Global offers no evidence to support this assertion, and none of these alleged multiple parties bids for the Debtors' inventory, belying Scan Global's belief that the alleged multiple inquiries show a robust market appetite for the inventory.

38. Moreover, Scan Global's own conduct further belies its present attempts to ascribe significant value to the inventory. As the holder of an alleged first-priority possessory lien, Scan Global would have been entitled to credit bid the full amount of its $3 million claim for the inventory that it was holding. If, as Scan Global contends, the inventory was worth significantly more than its $3 million claim and there were multiple parties interested in purchasing the inventory, then the economically rational course of action would have been to credit bid its $3 million claim. Had it done so, it would have established the value of the inventory to be at least

$3 million and thereby could have required a cash payment—specific to the inventory it held—from an alternate purchaser of at least $3 million in order to clear its credit bid. Absent such a higher cash bid for the inventory, Scan Global would then have exchanged its $3 million claim for the inventory through mechanism of its credit bid. Since Scan Global claims to believe that inventory was worth well in excess of $3 million and that Scan Global had identified willing buyers at or above that valuation, it could have then sold the inventory at a profit—an even better result than receiving a $3 million cash overbid. Yet Scan Global did not attempt to credit bid, even though its present assertions indicate that doing so would have been the most economically advantageous course of action. Scan Global's actions speak louder than its words.

39. Scan Global also ignores the fact that it was not holding all the Debtors' inventory. Scan Global claims—without evidence—that it "understands that it provide[d] somewhere between 70 and 90% of the Debtors' warehousing, shipping, and logistical needs." From there, it seems to imply that most of the Debtors' inventory therefore would have been held by Scan Global. But even if its unsupported assertions were true, Scan Global offers no argument, let alone evidence, of whether this alleged percentage volume of inventory equated to an equivalent percentage of the dollar value of the Debtors' inventory. Given Scan Global's thin and speculative assertions, it is equally plausible that, to the extent the Debtors had any valuable inventory, it was not in Scan Global's possession but in the Debtors possession or in the possession of another third party. Scan Global simply offers no evidence of the value of the inventory in its possession relative to inventory not in its possession. In fact, it offers no evidence of the inventory's value at all.

40. In sum, Scan Global offers no evidence to support the validity or extent of its claimed possessory liens. Accordingly, Scan Global has not met its burden and its objection should be overruled

## CONCLUSION

41. The Lenders have a valid, perfected, first-priority liens on all the Debtors' assets and are entitled to payment under the Distribution Motion in accordance with the Approval Order. For Scan Global to prevail, it needed to establish the priority, validity, and extent of its claimed possessory liens. But Scan Global failed to plead—let alone support and prove—the relevant factual predicates to support its asserted liens, and failed to apply the law to the facts as necessary to establish priority, validity, and extent of its asserted liens. Scan Global has even failed even to identify the relevant law applicable to its asserted liens. Therefore, Scan Global has not met its burden, and the Lenders respectfully request that the Court overrule the objection and grant the Distribution Motion.

Dated: May 19, 2024
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Matthew B. Harvey (No. 5186)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
mharvey@morrisnichols.com